**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BROWNING–FERRIS INDUSTRIES OF PENNSYLVANIA, INC., Respondent.**

No. 82–3022.

United States Court of Appeals, Third Circuit.

Argued Sept. 15, 1982.

Decided Oct. 28, 1982.

John P. Coyle, (argued), Carol A. De Deo, Lawrence J. Song, William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

James A. Prozzi (argued), Lubow & Prozzi, P. E., Pittsburgh, Pa., for respondent.

Before SEITZ, Chief Judge, ROSENN, Senior Circuit Judge, and GARTH, Circuit Judge.

## OPINION OF THE COURT

GARTH, Circuit Judge.

The sole issue on this appeal is whether Browning-Ferris Industries of Pennsylvania, Inc. (BFI) is a "joint employer" within the meaning of the National Labor Relations Act (NLRA). Thus, we are required to define the standard to be utilized in making this determination.

The National Labor Relations Board (NLRB) determined that BFI was a "joint employer." It then held that BFI had engaged in unfair labor practices within the meaning of Section 8(a)(1) of the NLRA (29 U.S.C. § 158(a)(1)) when it fired three drivers jointly employed by the company and its trucking brokers. The Board ordered BFI, jointly with its brokers, to offer the discharged employees reinstatement to their former or to substantially equivalent positions, or, if such positions were not available, to place those employees on a preferential hiring list. Finally, BFI was ordered to make the employees whole for any loss of pay resulting from BFI's unlawful conduct, and to post an appropriate notice.

The Board's decision and order, which adopted the findings and conclusions of the administrative law judge (ALJ), is reported at 259 NLRB No. 21. The ALJ had concluded *inter alia,* that (1) BFI and the independent trucking brokers were "joint employers" of the discharged drivers and (2) that BFI interfered with, thwarted, and restrained the drivers in the exercise of their Section 7 rights to seek increased wages and benefits, by firing two and barring a third driver from BFI property.

We hold that the Board applied the proper standard in determining that BFI was a "joint employer." We further conclude that substantial evidence in the record as a whole supports the Board's findings and we therefore enforce the Board's order.

### I.

BFI operates a refuse transfer site under contract with the City of Pittsburgh. City trucks haul refuse to the transfer site where BFI compacts the refuse and hauls it to a landfill area. BFI is required by law to transport the refuse to the landfill within 24 hours, or risk fines and cancellation of the contract. Although the City owns the land upon which the transfer station is located, BFI owns the compaction equipment and the trailers into which the compacted refuse is loaded. BFI employs bin loaders and other employees to operate this equipment.

BFI contracts with independent truckers, commonly referred to in the trade as "brokers," to furnish all tractors and all drivers to haul BFI's trailers between the transfer station and the landfill area. Pursuant to oral agreements, terminable at will by either party, brokers are compensated on a per load basis. BFI issues the brokers bimonthly checks and the brokers pay the drivers. Neither BFI nor the brokers withhold taxes from the drivers' pay. BFI additionally provides coverage under its group medical plan for one driver per tractor. The decision as to which driver receives the coverage is made by the broker.

The drivers wear coveralls similar to those worn by some of BFI's other employees, with the company's name—"BFI"—on the front. BFI provides these coveralls and has them cleaned by a cleaning service that is also used by BFI for its other employees. None of the tractors bears any broker identification. The trailers, which the brokers' tractors haul, all bear the BFI logo.

BFI carries comprehensive insurance on its trailers, but requires the brokers to carry liability insurance, and the brokers are liable for safety violations related to their tractors. Brokers also pay for their own fuel and are responsible for repairs and maintenance of their tractors, which they purchase with no financial assistance from BFI. Brokers do no maintenance work on the BFI trailers they haul, and must seek

special permission from the BFI plant manager, Bud Moersch, to unhook trailers in need of repair.

BFI, by posted notice at the transfer station, establishes the starting times for work; *i.e.,* two shifts beginning at 6 a. m. and 6 p. m., six days a week. BFI notes that the hours of operation at the transfer site itself were set by the City, and could only be changed by the City in accordance with the pickup schedule of the City's refuse haulers. However, BFI continues to have the authority to set up the shifts to be worked within the authorized hours of operation.

The brokers schedule the drivers for particular shifts and frequently drive their own tractors without regard to shift. BFI is concerned only that tractors and drivers are available at the transfer station when there is refuse to be handled.

Because the brokers are compensated on a per load basis, load logs are maintained both by BFI and the drivers, on forms provided by BFI. The logs are turned over to BFI's office, where they are reconciled. Copies are thereafter provided the brokers.

BFI establishes the speed limits at both the transfer station and landfill area and enforces compliance with the speed limits. BFI often specifies which of two available roads at the landfill is to be used by the drivers approaching and leaving the area. At the transfer station, BFI employees direct the trucks to specified loading areas and at the landfill, BFI employees direct the trucks to specific dumping areas.

All drivers must be approved by BFI before they are permitted to haul BFI trailers. That approval usually consists of on the job observation by BFI. If BFI determines that a driver is incapable of handling a tractor-trailer, the broker is notified and that driver is not permitted on the premises. BFI's managers also "criticize" drivers who arrive late at the transfer station, or leave early.

The ALJ also found as a fact, based on "credible testimony of drivers and brokers, unrefuted by [BFI] who did not offer testimony in this regard, ... that [BFI's] transfer plant manager, Moersch, on occasion effectively discharged and rehired drivers." Specifically, the ALJ found that:

(a) In July 1980, when driver Tully went home early with the tractor, Moersch said to him, "you can go home permanently ... yes, I am firing you" and told the broker he wanted another driver and that Tully "no longer was allowed on the property." Several days later, when Tully asked Respondent's Vice-President Curtis for his job back, Curtis stated there was no reason why he could not get his job back. When Moersch was informed, he told Tully to return to work the following day.

(b) In 1977, Moersch "fired" another driver, broker Anderson's son.

(c) On another occasion, when broker Anderson, driving his own tractor, left early, Moersch ordered him to report to his office the next day and there told him that neither the owner-operators nor the drivers were boss at the transfer station, but that he, Moersch, was.

(d) In February 1978, when driver Pontius improperly used a piece of Respondent's equipment to push his tractor and was accused of damaging the equipment, Moersch told broker Dietrich that Pontius was not allowed on the property. Moersch, when asked by Pontius for his job back, told him that he had gotten rid of one of the four bad apples; when told that Respondent's landfill manager Fazio had no objection to Pontius' return as a driver so long as he did not use Respondent's equipment, Moersch told Pontius that it was okay for him to return to work the following Monday.

(e) And, finally, on Sunday evening, August 24, 1980, Moersch telephoned driver Tully at home, telling him that his truck was "fired" and that he should not report in the following morning with the truck; he telephoned broker Anderson's wife at home, telling her that Respondent did not want the Anderson truck anymore and that "Tully's fired;" and he telephoned broker Buzy at home, telling

him that driver McDeavitt was no longer allowed on Company property.

Opinion at App. 8a–9a.

Finally the ALJ noted two other incidents which he felt were indicative of the relations between BFI and the drivers:

In late August 1980, Vice-President Curtis asked a driver to erase obscenities from the side of [BFI]'s trailer, despite the fact that [BFI] had responsibility to clean the trailers. And, also in 1980, [BFI]'s controller Bright, under emergency conditions where garbage was strewn from an overloaded trailer at a state police station, asked a driver to assist him and other [BFI] employees in the cleanup operation. The driver refused, stating that it was not a part of his job.

Opinion App. at 9a.

## II.

On appeal, BFI presents two arguments. First, BFI argues that the Board applied the wrong legal standard for determining "joint employer" status. Second, BFI maintains that, when the standard which it urges upon this court is applied, the evidence does not support the conclusion that BFI and the brokers were "joint employers" of the discharged drivers. We consider each argument in turn.

## A.

The propriety of the Board's findings of unfair labor practices turns upon the threshold question of whether BFI and its trucking brokers were "joint employers." *Cf. Radio Union v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 85 S.Ct. 876, 13

L.Ed.2d 789 (1965); *Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); *NLRB v. Condenser Corp. of America,* 128 F.2d 67, 71–72 (3d Cir. 1942). The Board, in deciding this issue applied the standard for "joint employer" status as set out by the Supreme Court in *Boire v. Greyhound Corp., supra,* 376 U.S. at 481, 84 S.Ct. at 898–899. Under this standard, the question of "joint employer" status is a factual one and requires an examination into whether an employer who is claimed to be a "joint employer" "possessed sufficient control over the work of the employees to qualify as a 'joint employer' with [the actual employer]." 376 U.S. at 481, 84 S.Ct. at 898–899.

BFI, however, contends that there is no basis for distinguishing between the "single employer" and "joint employer" concepts. BFI argues that the correct standard to apply in cases where a determination of either "single" or "joint" employer status is at issue, is that standard set out by the Supreme Court in *Radio Union v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965) and rearticulated by the Board in *Parklane Hosiery Co., Inc.,* 203 NLRB 597, 612 (1973). This rule, BFI contends, requires the consideration of four factors by the Board before two or more *nominally separate business entities* may properly be considered *sufficiently integrated* to warrant their unitary treatment.[1] Thus, BFI submits that, in light of two other Board decisions, and two Eighth Circuit cases,[2] the correct standard is not whether there is significant control (by BFI) over the work of the employees

---

1. The factors as set out in *Parklane,* 203 NLRB at 612 include:

   The principal factors which have normally been deemed relevant, when this Board must decide whether *sufficient integration* exists, have covered broadly certain demonstrable relationships between the several business entities concerned; the Board considers whether their *total relationship* reveals (1) some functional integration of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. While none of the factors, separately viewed, have been held controlling, stress has normally been

   laid upon the first three factors which reveal functional integration with particular reference to whether there is centralized control of labor relations. (citations omitted) (emphasis supplied).

2. Teamsters Local 85, 253 NLRB 632 (1980); Malcolm Boring Co., 259 NLRB No. 81, 108 LRRM 1398 (1981); *Pulitzer Publishing Co. v. NLRB,* 618 F.2d 1275 (8th Cir. 1980), *cert. denied,* 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96 (1980); *Miscellaneous Drivers and Helpers Union, Local No. 610 v. NLRB,* 624 F.2d 831 (8th Cir. 1980).

employed by the actual employer (the brokers). Rather, BFI contends that the correct standard to be utilized is the four factor standard established in *Radio Union* and *Parklane*. A careful reading of the relevant cases makes clear that BFI's contention is incorrect.

The "joint employer" and "single employer" concepts are distinct. Admittedly, there has been a blurring of these concepts at times by some courts and by the Board.[3] However, as the Supreme Court itself has recognized, the two concepts approach the issue of "who is the employer," from two different viewpoints. As such, different standards are required for each—that enunciated in *Radio Union v. Broadcast Service of Mobile, Inc., supra,* to apply in the "single employer" context and that set out in *Boire v. Greyhound Corp., supra,* to apply in the "joint employer" context.

### 1.

■ A "single employer" relationship exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a "single employer." The question in the "single employer" situation, then, is whether the two nominally independent enterprises, in reality, constitute only *one integrated enterprise.* This was the question before the Supreme Court in *Radio Union, supra,* as well as the question before the Board in *Parklane, supra.* The answer given in each situation, was that the employer was a "single employer."[4]

■ In answering questions of this type, the Board considers the four factors approved by the *Radio Union* court. (380 U.S. at 256, 85 S.Ct. at 877): (1) functional integration of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership. Thus,

the "single employer" standard is relevant to the determination that "separate corporations are not what they appear to be, that in truth they are but divisions or departments of a single enterprise." *NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 402, 80 S.Ct. 441, 443, 4 L.Ed.2d 400 (1960). "Single employer" status ultimately depends on all the circumstances of the case and is characterized as an absence of an "arm's length relationship found among unintegrated companies." *Local 627, International Union of Operating Engineers v. NLRB,* 171 U.S.App.D.C. 102, 107–108, 518 F.2d 1040, 1045–46 (1975), *aff'd on this issue sub nom. South Prairie Construction Co. v. Local 627, International Union of Operating Engineers,* 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976); *NLRB v. Don Burgess Const. Corp.,* 596 F.2d 378, 384 (9th Cir. 1979); *Walter B. Cooke,* 262 NLRB No. 74 (June 30, 1982) (slip op. at 30–31).

### 2.

■ In contrast, the "joint employer" concept does not depend upon the existence of a single integrated enterprise and therefore the above-mentioned four factor standard is inapposite. Rather, a finding that companies are "joint employers" assumes in the first instance that companies are "what they appear to be"—independent legal entities that have merely "historically chosen to handle jointly ... important aspects of their employer-employee relationship." *NLRB v. Checker Cab Co.,* 367 F.2d 692, 698 (6th Cir. 1966).

■ In "joint employer" situations no finding of a lack of arm's length transaction or unity of control or ownership is required, as in "single employer" cases. As this Circuit has maintained since 1942, "[i]t is rather a matter of determining which of

---

**3.** See note 2, *supra; Parklane, supra,* 203 NLRB 597.

**4.** In *Radio Union,* the issue was whether Radio Station WSIM was an integral part of a group of radio stations owned and operated by the Holt Broadcasting Service. It was contended in that case that the two companies constituted a single enterprise.

In *Parklane Hosiery, supra,* the issue was whether a franchisor and a nominal franchisee were "throughout the period with which this case is concerned affiliated businesses with substantially common officers, directors, ownership and common control over labor relations policy." 203 NLRB at 612.

two, or whether both, respondents control, in the capacity of employer, the labor relations of a given group of workers." *NLRB v. Condenser Corp. of America, supra,* 128 F.2d at 72 (citations omitted). The basis of the finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. *Walter B. Cooke,* 262 NLRB No. 74 (1982) (slip op. at 31). Thus, the "joint employer" concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment. *C.R. Adams Trucking, Inc.,* 262 NLRB No. 67 (June 30, 1982) (slip op. at 5); *Ref-Chem Co. v. NLRB,* 418 F.2d 127, 129 (5th Cir. 1969); *NLRB v. Greyhound Corp.,* 368 F.2d 778, 780 (5th Cir. 1966).

The Supreme Court addressed the subject of "joint employer" in its *Boire, supra,* opinion. The issue there, in part, was whether the Greyhound Corporation and Floors, an independent corporation unrelated to Greyhound, "share[d] or co-determine[d] those matters governing [the] essential terms and conditions of employment of the porters, janitors, and maids," Floor's employees working under contract in Greyhound facilities. *NLRB v. Greyhound Corp.,* 368 F.2d 778, 780 (5th Cir. 1966) (on remand from *Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964) reversing *Boire v. Greyhound Corp.,* 309 F.2d 397 (5th Cir. 1962). In reversing the original Fifth Circuit opinion, the Supreme Court concluded that:

Whether Greyhound, as the Board held, possessed sufficient control over the work of the employees to qualify as a joint employer with Floors is a question which is unaffected by any possible determination as to Floors' status as an indepen-

dent contractor, since Greyhound has never suggested that the employees themselves occupy an independent contractor status. And whether Greyhound possessed sufficient indicia of control to be an "employer" is essentially a factual issue.

*Boire, supra,* 376 U.S. at 481, 84 S.Ct. at 899. On remand, the Fifth Circuit applied this standard and found that Greyhound and Floors were "joint employers" of the janitors and porters. *NLRB v. Greyhound Corp., supra,* 368 F.2d at 781.

B.

The cases cited by BFI are not helpful. In *Parklane Hosiery, supra,* the issue before the Board was whether a franchisor and a nominal franchisee (Roberts) constituted a single integrated business, or, whether the two companies in their joint operations, shared control over a number of employees. 203 NLRB at 613. Based on the facts found there, the Board determined that Parklane and Roberts constituted a "single employer." In so doing, it tested the evidence by the "single employer" four factor standard of *Radio Union.* Because no "joint employer" concept was involved in *Parklane,* the Board's discussion in its opinion of a "joint employer" standard is not governing, and must be considered dicta even though we acknowledge that that discussion has contributed to understandable confusion in this whole area. Indeed at oral argument, counsel for the Board went to considerable lengths to explain away the confusion engendered by the *Parklane* opinion and to place the *Parklane* decision in the correct perspective—a perspective with which we agree.[5]

It is significant that when the Supreme Court decided *Radio Union,* it discussed the Board's four factor "single employer" standard, which ultimately found expression again in the *Parklane* decision. Only the

---

5. *Malcolm Boring Co.,* 259 NLRB No. 81,108 LRRM 1398 (1981) is not to the contrary. There, as in *Parklane* the ALJ used the *Radio Union* criteria to determine status, because the companies involved were found to be a *"single*

*employer,"* not a "joint employer." Nor did the Board in its opinion ever refer to *Malcolm Boring* as a "joint employer" case. 108 LRRM at 1398–99.

"single employer" standard was described in *Radio Union*. Nowhere did the *Radio Union* Court mention *Boire* which was a "joint employer" case, and which was decided in the previous term. Thus, we are left with the clear understanding that the Court in *Radio Union* was not concerned with a "joint employer" standard.

We recognize that courts in other circuits have either imposed the "single employer" standard in "joint employer" situations,[6] or have created a hybrid standard of sorts for determining "single employer" or "joint employer" status by merging the *Boire* and the *Radio Union* standards.[7] Despite these expressions, we are satisfied that the appropriate standard for determining "joint employer" status is to be found in the Supreme Court's *Boire* opinion, and that the appropriate standard for determining "single employer" status is to be found in the Supreme Court's *Radio Union* opinion. Not only do these standards carry out the purpose of the NLRA, but they are logical and functional. Of additional importance to us, they were presaged by our own Third Circuit opinion in *NLRB v. Condenser Corp. of America, supra*.

■ We hold therefore that in the context of this case, the Board chose the correct standard—the "joint employer" standard—to apply to its analysis of the facts of this case: where two or more employers exert significant control over the same employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they constitute "joint employers" within the meaning of the NLRA. *Boire v. Greyhound Corp., supra*, 376 U.S. at 481, 84 S.Ct. at 898–899; *Sheeran v. American Commercial Lines, Inc.*, 683 F.2d 970, 978 (6th Cir. 1982); *North American Soccer League v. NLRB*, 613 F.2d 1379, 1381–83 (5th Cir. 1980); *Lutheran Welfare Services of Illinois v. NLRB*, 607 F.2d 777, 778 (7th Cir. 1979);

*NLRB v. Jewell Smokeless Coal Corp.*, 435 F.2d 1270, 1271 (4th Cir. 1970); *Ace-Alkier Freight Lines, Inc. v. NLRB*, 431 F.2d 280, 282–83 (8th Cir. 1970); *Ref-Chem Co. v. NLRB*, 418 F.2d 127, 129 (5th Cir. 1969); *S. S. Kresge Co. v. NLRB*. 416 F.2d 1225, 1230–31 (6th Cir. 1969); *Gallenkamp Stores Co. v. NLRB*, 402 F.2d 525, 530–31 (9th Cir. 1968); *NLRB v. Greyhound Corp., supra*, 368 F.2d at 778–81; *NLRB v. Checker Cab Co., supra*, 367 F.2d at 698; *NLRB v. Condenser Corp. of America, supra*, 128 F.2d at 71–72; *NLRB v. Lund*, 103 F.2d 815, 819 (8th Cir. 1939); *Walter B. Cooke, supra*, 262 NLRB No. 67 (slip op. June 30, 1982); *C. R. Adams Trucking Co.*, 262 NLRB No. 67 (slip op. June 30, 1982 at 4–5); *O'Sullivan, Muckle, Kron Mortuary*, 246 NLRB 164, 165 (1979); *Atwood Leasing Corp.*, 227 NLRB 1668, 1669 (1977); *The Southland Corporation*, 170 NLRB 1332, 1334 (1968); *S. A. G. E., Inc.*, 146 NLRB 325, 326–27 (1964); *Frostco-Super Save Stores, Inc.*, 138 NLRB 125 (1962); *Franklin Simon & Co.*, 94 NLRB 576 (1951).

### C.

■ A careful consideration of the evidence presented, reviewed in its entirety, makes plain that substantial evidence exists on which the ALJ and the Board based its "joint employer" finding, that BFI and the brokers *shared* or co-determined those matters governing the essential terms and conditions of employment of the drivers.

We have set out in some detail, in Part I of this opinion, the evidence which supports the findings made by the ALJ and adopted by the Board. In sum, that evidence may be capsuled as follows: BFI shared with the brokers the right to hire and fire the drivers, and indeed Moersch, BFI's supervisor, considered himself "boss" and acted as "boss" with respect to the employees' functions. BFI established the work hours of the drivers, determining when the two

---

6. *Pulitzer Publishing Co. v. NLRB*, 618 F.2d 1275 (8th Cir. 1980), *cert. denied*, 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96 (1980) and *Miscellaneous Drivers and Helpers Union, Local No. 610 v. NLRB*, 624 F.2d 831 (8th Cir. 1980).

7. *Davis v. NLRB*, 617 F.2d 1264, 1271 (7th Cir. 1980); *Sheeran v. American Commercial Lines, Inc.*, 683 F.2d 970 (6th Cir. 1982).

shifts it established would start and end. BFI provided the drivers with the same uniforms it provides its own employees. BFI and the brokers together determined the drivers' compensation and shared in the day to day supervision of the drivers. BFI directed the drivers at the transfer and landfill sites as if they were their own employees, and BFI forms are used for record keeping purposes. Finally, BFI shared with the brokers the power to approve drivers, and devised the rules under which the drivers were to operate at BFI sites. The existence of all these facts constitutes substantial evidence which supports the Board's finding that BFI exerted significant control over the work of the drivers. *North American Soccer League v. NLRB, supra,* 613 F.2d at 1382; *NLRB v. Greyhound Corp., supra,* 368 F.2d 778 (applying the "joint employer" standard prescribed by the Supreme Court in *Boire* on remand). Thus, BFI was correctly held to be a co-employer of the drivers.

### III.

On appeal, BFI did not raise any issue with respect to the Board's finding that BFI fired the drivers because they had engaged in protected concerted activities. BFI thus waived any such issue before us. *Dreis & Krump Mfg. Co., Inc. v. NLRB,* 544 F.2d 320 (7th Cir. 1976); *NLRB v. Tennessee Packers, Inc.,* 344 F.2d 948, 949 (6th Cir. 1965) ("Since respondent's brief failed to challenge the Board's order on the merits, that issue is considered as having been abandoned and will not be considered by the Court on this review."). Consequently, having held that the Board's "joint employer" standard was correctly applied to BFI, we will enforce the Board's order of November 2, 1981.