18. Mudsills. When mudsills are to be placed for supporting concrete forms, a reasonably level and sufficiently compacted surface will be furnished to Ceco by the Contractor

19. Grades. Ceco assumes no responsibility for establishing grades or general layout. The Contractor shall establish all elevations, working points, angles and opening locations clearly marked on concrete or forms as required and shall verify same prior to pouring concrete.

20. Safety Barriers. Ceco assumes no responsibility for erecting and maintaining protective devices or barriers around openings and/or at the perimeter of the building on formwork and completed slabs, but will repair or replace any such devices damaged by Ceco. Should the Contractor, Governmental Agency or others require Ceco to furnish and/or erect any such protective devices or barriers, the Contractor shall reimburse Ceco for all costs incident to same.

21. Termination. If work on the structure is terminated before completion of this work, this contract shall terminate; and Contractor shall pay Ceco for all engineering or drafting services, materials shipped and work performed plus a reasonable profit.

22. Assignment Neither party shall assign this contract or sublet it as a whole without the written consent of the other.

23. Modifications. This contract cannot be modified except by a writing signed by both of the parties.

24. Entire Agreement. This writing is intended by the parties as a final expression of their agreement and is intended also as a complete and exclusive statement of the terms of their agreement.

25. Effective Date. This contract shall become effective either when signed and delivered by Contractor to Ceco and accepted in writing by Ceco at its home office or when Contractor orders commencement of the work under this contract.

26. Enforcement Costs. In any action or proceeding brought to enforce any of the provisions of this contract, prevailing party shall recover the cost thereof, including attorney's fees, from the other party.

TERMS: Contractor agrees to pay Ceco 90% of the contract value of work performed monthly on or before the 15th day of the following month and pay the remaining 10% within 30 days after substantial completion of the work under this contract.
TAXES: Unless specifically included in the price above, the amount of any applicable sales, use or comparable tax on receipts which Ceco may be required collect will be added to each invoice.

Carson Concrete Corporation
Contractor

By

THE CECO CORPORATION
Proposed
By A. P. Tuno
Approved at Ceco's home office
By

**LOCAL 773, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN, AND HELPERS OF AMERICA**
v.
**COTTER & COMPANY.**
Civ. A. No. 86–6635.
United States District Court,
E.D. Pennsylvania.
June 21, 1988.

housemen and Helpers of America ("Local 773" or the "union") brought suit to compel defendant Cotter & Company ("Cotter") to arbitrate a grievance regarding the layoff of its members employed by Mack Transportation Company ("Mack"). Local 773 contends that Cotter is a joint employer with Mack and, therefore, bound to arbitrate grievances pursuant to the collective bargaining agreement signed by Mack and Local 773.

On January 8, 1987, defendant Cotter filed a motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim arguing that Cotter cannot be compelled to arbitrate because it is not a joint employer with Mack and, therefore, is not bound by the bargaining agreement between Mack and Local 773. Because Cotter filed affidavits in support of its motion to dismiss, I deemed the motion to be one for summary judgment by order dated March 12, 1987. Plaintiff Local 773 filed a response to this motion and a cross-motion for summary judgment on April 15, 1987.[1]

I held oral argument on these cross-motions on February 22, 1988. No material issue of fact exists regarding the issue of whether Cotter and Mack are joint employers. I will grant defendant Cotter's motion for summary judgment and deny plaintiff's for the reasons stated below.

Stephen C. Richman, Philadelphia, Pa., for plaintiff.

Carter Buller, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Plaintiff Local 773, International Brotherhood of Teamsters, Chauffeurs, Ware-

## I. FACTS

Defendant Cotter, the parent company of True Value hardware stores, operates fourteen regional distribution centers across the country, including one in Allentown, PA. (Lynn affidavit at para. 2).[2] The Allentown center is responsible for receiving merchandise from Cotter factories and delivering it to local member stores. (Lynn affidavit at para. 3). Rather than employing its own drivers or delivering the merchandise by common carrier, Cotter con-

---

1. On April 22, 1987, Cotter filed a second motion for summary judgment based on a statute of limitations argument. I need not reach this motion because of my disposition of the joint employer issue.

2. Richard Lynn is Vice–President and general counsel for Cotter. His affidavit was filed by Cotter in support of its motion for summary judgment.

tracted out its driving to Mack, a transportation company which provides delivery service for numerous companies. (Lynn affidavit at para. 28). No owner of Mack has ever held an ownership interest in Cotter. Cotter and True Value storeowners have never held any ownership interest in Mack. *Id.* Mack's drivers are represented by plaintiff Local 773 and their relationship with Mack is governed by a collective bargaining agreement which mandates the arbitration of grievances. (Lynn affidavit at para. 6). Cotter is not a signatory to this collective bargaining agreement and has no authority to reject any bargaining agreement that Mack enters into with the union. Nor does the agreement between Mack and Local 773 obligate Cotter to arbitrate grievances. (Lynn affidavit at para. 7).

Mack's relationship with defendant Cotter is governed by a leasing agreement dated September 26, 1987 (the "leasing agreement"). (Exhibit A to Lynn affidavit). That agreement provided that Mack

> will have sole control and responsibility for, and will be sole signatory under and connected with all labor negotiations, grievances, collective bargaining agreements, and related items concerning drives furnished to lessee [Cotter] under this agreement.

(Leasing Agreement at para. 18). Mack's responsibilities under the leasing agreement also include the payment of drivers' wages and benefits; the withholding and payment of federal and state employment taxes for its drivers; the maintenance of its drivers' payroll records and workers' compensation insurance; and the compliance with all applicable state and federal laws relative to its drivers' employment. (Leasing Agreement at para. 4).

According to the agreement, Cotter is responsible for "dispatch[ing], direct[ing] the loading and unloading of vehicles, se-

lect[ing] routes, direct[ing] drivers as to pickups, deliveries and other matters related to the day to day operation of the vehicles utilized by lessee [Cotter]." (Leasing Agreement at para. 9). Cotter's responsibilities also include obtaining and maintaining records to comply with ICC and DOT regulations, periodically checking drivers' logs to ensure their compliance with any applicable state and federal governmental regulations; insuring the trucks owned or leased by Cotter and driven by Mack employees; insuring the Mack employees while they are driving for Cotter; and indemnifying Mack for any payments that Mack has to make arising out of grievance settlements concerning Mack employees who drive for Cotter.

The agreement reserves to Cotter the right to terminate the assignment of any driver if Cotter finds that

> a) such driver conducts himself in such a way as to result in an increased premium on any insurance policy carried by Cotter, or b) such driver is not competent, or c) such driver is not or fails to continue to be duly licensed, or d) such driver's health is at any time less than required for the work involved.

(Leasing Agreement at para. 3). In exchange for the drivers' services, Cotter agreed to pay Mack an amount equal to the drivers' wages, employment taxes, and employee benefit costs paid by Mack to the union. (Leasing Agreement Schedule A).

The actual operation of the Cotter Allentown distribution center is consistent with the above described agreement. Mack conducted all interviewing and hiring of the drivers. (Halsey affidavit at para. 3).[3] Cotter dispensed Mack employment applications, but referred all such applications to Mack without comment.

Mack also conducted all collective bargaining negotiations with Local 773. (Hal-

---

**3.** Robert Halsey is the operating manager at Cotter's Allentown distribution center. His affidavit was filed by Cotter in support of Cotter's motion for summary judgment.

sey affidavit at para. 5). Cotter had no authority to reject any collective bargaining agreement into which Mack and the union entered and did not participate in Mack's negotiations with the union. (Banus Transcript at p. 8–10; 15–16; 42–44).[4] However, according to Stephen Banus, Mack officials informed the union that Mack had to check with Cotter before agreeing to any collective bargaining terms. (Banus deposition at p. 15, lines 14–15; 44, lines 9–11).

Cotter did express dissatisfaction with the results of Mack's collective bargaining efforts. (Defendant Cotter's reply to Local 773's motion for summary judgment at 3). For example, Cotter twice told Mack officials and Mack drivers that Cotter's driver costs were the highest in the area. (Halsey deposition at p. 37–38). However, these complaints were fruitless. The union twice refused to concede to Mack's requests pursuant to Cotter complaints for midterm contract negotiations: once in 1984 after Cotter representatives complained about labor costs (Banus deposition at p. 40, lines 13–41) and again in 1985 after Mack and Local 773 negotiated a three year contract dissatisfactory to Cotter. (Banus deposition at 43–46).

Mack had exclusive authority to discipline its drivers, and issued all disciplinary notices. If a problem existed with drivers' logs or reports, Cotter forwarded the logs to Mack. (Halsey affidavit at para. 8). Mack also had exclusive authority to decide whether an accident was preventable. (Halsey affidavit at paras. 6, 7).

Cotter recommended the discipline of several drivers, but those recommendations were infrequently followed by Mack. (Hal-

sey affidavit at para. 6).[5] After receiving a report of a disciplinary problem from Cotter, Mack would make an independent investigation of the complained of conduct to determine whether and to what extent an employee should be disciplined. (Halsey affidavit at para. 7). Although the leasing agreement between Cotter and Mack gave Cotter the power to terminate the assignment of any driver found to be incompetent, Cotter was bound by the outcome of any grievance procedures between Mack and Local 773. If the outcome of a grievance procedure dictated the rehiring of an employee, Cotter was forced to take the employee back.[6] Cotter's receiving manager occasionally attended disciplinary grievances between Mack and Local 773. However, his only purpose in attending such meetings was to outline the particular facts of each case. (Halsey affidavit at para. 8; Banus deposition at p. 37, line 19–20).

As for the scheduling of work assignments, route assignments were based on seniority. (Halsey affidavit at para. 13). The most senior Mack driver would pick up his route, and; thereafter, runs were selected by drivers in seniority order. (Halsey affidavit at para. 13). The drivers on this seniority list carried seniority only for purposes of employment at Cotter. The drivers at Cotter could not transfer to any other Mack seniority list. (Banus deposition at p. 84–85). The Cotter traffic supervisor decided how many runs were needed each day. (Halsey deposition at 8). Cotter also retained the right to adjust or modify routes. (Halsey deposition at 23). If a driver were sick, he would notify Cotter, not Mack.

Mack had no full-time employees located in the Allentown area. (Forster deposition

---

**4.** Stephen Banus is the Secretary–Treasurer of Local 773. His deposition was filed by Local 773 in support of its motion for summary judgment.

**5.** For example, Cotter recommended that employee Robert Rainey be suspended for one week because he was out of uniform. However, Mack only gave Rainey a written warning. (Halsey affidavit at para. 11; Cotter letter and

Mack disciplinary letter attached to Halsey affidavit as Exhibits C and D).

**6.** For example, a driver named Bowman was fired by Mack after Cotter refused to allow him to drive because he falsified mileage records. Bowman was reinstated by Cotter after a grievance committee ordered Mack to reinstate him. (Banus deposition at p. 25, line 11 to p. 28 line 16).

at p. 23).[7] Drivers would call the Cotter traffic supervisor to find out if work was available. (Halsey deposition at p. 8). Drivers also turned in their drivers' reports and delivery receipts to Cotter's traffic department at the end of each day. (Forster deposition at p. 8). The drivers drove trucks with the True Value logo supplied by Cotter and wore True Value uniforms. (Halsey deposition at p. 43–44). Cotter also instructed drivers on particular aspects of their driving responsibilities such as how to ship wet batteries, how to jockey a truck and how to lock gates and cable covers properly. (See Exhibits 11, 10, and 13 to Forster deposition). Cotter also held two safety meetings per year with Mack drivers. (Halsey deposition at p. 31).

On November 1, 1985, Cotter notified Mack and the union that it was cancelling its contract with Mack effective January 31, 1986. (Lynn affidavit at para. 16). In January of 1986, Cotter hired Myers' Men, Inc. ("Myers") to perform its trucking needs. (Lynn affidavit at para. 18). Myers offered each of Mack's former Allentown drivers the opportunity to become a Myers' employee under the terms of its collective bargaining agreement with Local 773. No driver accepted the offer. (Lynn affidavit at para. 19).

On February 3, 1986, Local 773 filed an unfair labor practice charge with the Philadelphia office of the National Labor Relations Board (NLRB) alleging that Cotter, as a joint employer with Mack, violated section 8(a)(5) of the National Labor Relations Act by laying off Mack's unit drivers and repudiating the collective bargaining agreement between Mack and Local 773. (Exhibit J to Lynn affidavit).

On March 31, 1986, the Acting Regional Director of the NLRB's Philadelphia office refused to issue a complaint against Cotter. (Exhibit K to Local 773's brief in opposition to defendant's motion for summary judgment). The Acting Regional Director found that Cotter and Mack were not joint employers stating

[Cotter] and Mack have no common ownership or control. The drivers were hired and paid by Mack, and Mack was responsible for the discipline of the drivers. Collective bargaining was conducted exclusively by Mack, which controlled labor relations policies for the drivers. The scheduling of routes was determined by seniority. In these circumstances, it was concluded that Cotter and Mack are not joint employers.

(Exhibit K to Lynn affidavit).

Local 773 appealed the Acting Director's refusal to issue a complaint against Cotter to the Labor Board's General Counsel. On April 30, 1987, the General Counsel upheld the Acting Director's refusal to issue a complaint against Cotter. (Exhibit M to Lynn affidavit). According to the Appeals Director, insufficient evidence existed to establish that Cotter was a joint employer with Mack. *Id.*

On January 30, 1986, Local 773 filed a grievance against Cotter alleging that the layoff of Mack employees and the usage of non-bargaining unit employees to perform bargaining unit work violated the union's collective bargaining agreement with Mack. (Exhibit F to Lynn affidavit). By letter dated February 12, 1986, Cotter rejected this grievance stating that it was not a signatory to the Mack–Local 773 collective bargaining agreement. (Exhibit G to Lynn affidavit).

On June 17, 1986, Local 773 filed a demand for arbitration with the American Arbitration Association (AAA) regarding the above grievance. By letter dated August 28, 1986, the AAA notified the parties that it would not arbitrate the grievance because no collective bargaining agreement existed between Cotter and Local 773. (Exhibit F to plaintiff's response to defendant's motion for summary judgment). On November 12, 1986, plaintiff union filed this suit to compel arbitration of the above grievance.

---

**7.** Joseph B. Forster is Cotter's traffic supervisor. His deposition was filed by Cotter in support of its motion for summary judgment.

## II. DISCUSSION

Summary judgment is appropriate if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Small v. Seldows Stationery*, 617 F.2d 992, 994 (3d Cir.1980). The court does not resolve questions of disputed fact, but simply decides whether there is a genuine issue of material fact which must be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). *Ettinger v. Johnson*, 556 F.2d 692 (3d Cir.1977). After reviewing the cross-motions for summary judgment, I am satisfied that there exists no genuine issue of material fact regarding the question of whether Mack and Cotter are joint employers.

Joint employer status was fully discussed by the Third Circuit in *N.L.R.B. v. Browning–Ferris Industries*, 691 F.2d 1117 (3d Cir.1982). According to the Third Circuit, joint employer status is a

> matter of determining which of two, or whether both, respondents control the labor relations of a given group of workers. The basis of the finding is simply that one employer, while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus, the joint employer concept recognizes that the business entities are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment.

*Id.* at 1123 (citations omitted).

■ Whether the supposed joint employer possesses sufficient indicia of control is essentially a factual issue, *Boire v. Greyhound Corp.*, 376 U.S. 473, 481, 84 S.Ct. 894, 898–99, 11 L.Ed.2d 849 (1964), to be decided with reference to the following standard set out by the Third Circuit in *Browning–Ferris:*

> where two or more employers exert significant control over the same employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they constitute "joint employers" within the meaning of the NLRA.

*Browning–Ferris*, 691 F.2d at 1124.

In *Browning–Ferris*, the Third Circuit held that Browning–Ferris, Inc. ("BFI") was a joint employer with several trucking brokers that contracted to provide truck drivers to BFI. The following evidence was relied upon by the Third Circuit in coming to its conclusion that BFI and the trucking companies were joint employers:

> BFI shared with the brokers the right to hire and fire the drivers, and indeed ... BFI's supervisor considered himself "boss" and acted as "boss" with respect to the employees functions. BFI established the work hours of the drivers, determining when the two shifts it established would start and end. BFI provided the drivers with the same uniforms it provided its own employees. BFI and the brokers together determined the drivers' compensation and shared in the day to day supervision of the drivers. BFI directed the drivers at the transfer and landfill sites as if they were their own employees, and BFI forms are used for recordkeeping purposes. Finally, BFI shared with the brokers the power to approve drivers, and devised the rules under which the drivers were to operate at BFI sites.

*Id.* at 1124–25.

■ To establish joint employer status, plaintiff must show that the supposed joint employer "meaningfully affects" matters relating to the employment relationship, *General Teamsters Local Union 326 v. Crown Zellerbach*, 117 L.R.R.M. (BNA) 1169 (1984), *enforced by*, 772 F.2d 894 (3d Cir.1985), such as (1) hiring and firing, *Browning–Ferris*, 691 F.2d at 1124, (2) discipline, *Carrier Corp. v. NLRB*, 768 F.2d 778, 780 (6th Cir.1985), (3) wages, insurance, and records, *Clinton's Ditch Co-op. Co. v. NLRB*, 778 F.2d 132, 138 (2d Cir. 1985), *cert. denied sub nom., Teamsters Local 317 v. Clinton's Ditch Co-op. Co.*, 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986), (4) day to day supervision and

direction, *Industrial Personnel Corp. v. NLRB,* 657 F.2d 226, 229 (8th Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 302 (1982), and (5) participation in collective bargaining, *Clinton's Ditch,* 778 F.2d at 139.

■ After carefully balancing these five factors, I must conclude that Mack and Cotter are not joint employers. The union agrees that Mack performed all of the interviewing and hiring of drivers. It also appears that Mack had responsibility for and actually performed all of the firing of its drivers. The example cited by the union in support of its argument that Cotter participated in the firing of drivers actually supports the conclusion that Cotter did not have the power to fire drivers. In this incident, an employee was fired at Cotter's insistence for falsifying mileage records. However, Cotter ultimately was forced by Mack to rehire the employee after he was reinstated through the union-Mack grievance procedure. (*See* Banus deposition at p. 25, line 11, to p. 28, line 16; *supra* at note 6).

Nor does paragraph 3 of the leasing agreement between Mack and Cotter, which states that Cotter may reject any driver that does not meet its requirements, dictate a different result. It seems that any power to reject drivers given to Cotter by this paragraph was merely theoretical. The union has pointed to no evidence, other than the above incident, showing that Cotter ever exercised this paragraph. Further, the incident described above illustrates that Cotter lacked any real power to reject drivers sent to it by Mack. *See Laerco, Inc.,* 269 N.L.R.B. 324 (N.L.R.B. 1984) (board refused to find a company a joint employer although a clause in the leasing contract provided that the company could reject any driver provided by the lessor that did not meet the company's qualifications).

It seems equally clear that Mack had primary responsibility for disciplining drivers. Cotter forwarded any customer complaints, accident reports, or problems with driver's logs to Mack for resolution. After receiving notice of a disciplinary problem from Cotter, Mack performed an independent investigation in all cases. Mack also issued all disciplinary notices and decided what punishment was warranted in each case.

Although Cotter, at times, recommended disciplinary measures,[8] Mack frequently refused to follow this advice. Further, when Mack did follow Cotter's disciplinary advice, the discipline failed to "stick." As discussed above, in the specific incident cited by the union, Cotter was forced to reinstate an employee who had falsified mileage records.

In sum, Cotter's recommending discipline or sending customer complaints to the union does not suggest that Cotter was responsible for disciplining the drivers. Any business which uses the employees of another has a legitimate interest in determining whether its subcontractor's employees are performing satisfactorily. "An employer need not mutely suffer incompetence or misbehavior by its sub-contractor's employees in order to avoid status as a joint employer." *Clinton's Ditch,* 778 F.2d at 138.

Under the leasing contract, Mack is responsible for paying the driver's wages and benefits. Mack is also responsible for withholding federal taxes from its driver's wages, and maintains payroll records and its driver's workman's compensation insurance. These responsibilities also tend to show that Mack is the sole employer of the drivers.

---

**8.** Plaintiff union notes that Joe Forster, Cotter's Traffic Supervisor, issued a memorandum which advised the drivers that idletime was excessive. The memorandum concluded "please don't make it necessary to resolve this by disciplinary action." The union argues, based on this one memorandum, that Cotter was threatening direct disciplinary action. However, this memorandum does not state that Cotter was going to discipline the drivers. The memorandum is consistent with the disciplinary process described above by which Cotter made disciplinary recommendations to Mack, but Mack actually decided what type of discipline was warranted in each case.

The union argues that Cotter indirectly pays the driver's wages and benefits when it pays Mack its leasing fee. This argument is without merit. The important question is who controls the amount of wages that the drivers receive. Mack controls the amount of wages through the collective bargaining process. Further, Cotter is bound by the leasing agreement to pay to Mack as part of the leasing fee any increase in wage negotiated by Mack and the union.

It is equally clear that Mack was responsible for and had sole authority over collective bargaining matters. Cotter did not sign the collective bargaining agreement between the union and Mack, nor did it attend collective bargaining negotiations. The leasing contract gave to Mack sole control and responsibility for all collective bargaining negotiations and grievance matters. As the sole signatory to the collective bargaining agreement and as the sole negotiator for management in bargaining sessions, Mack, in cooperation with the union, decided the drivers' wages, benefits, and other terms and conditions of employment. Cotter had no authority to reject collective bargaining agreements reached by Mack and the union.

The union argues that Cotter had indirect input into the collective bargaining process because Cotter complained to Mack about the high labor costs attributed to the drivers. The union also argues that Mack stated that it had to check with Cotter during negotiations. Cotter's complaints to Mack concerning the high cost of labor do not make Cotter a participant in collective bargaining negotiations. Cotter was merely acting like any other customer who complains to a seller about the high cost of the seller's product.

That Mack may have told union officials during contract negotiations that it had to check with Cotter before agreeing to contract terms also does not convince me that Cotter participated in collective bargaining negotiations. The union merely states that Mack told it that Mack had to check with Cotter officials. Local 773 has offered no evidence to show whether Mack actually consulted with Cotter before agreeing to collective bargaining terms or whether Mack officials made this statement merely as a bargaining ploy. *See Clinton's Ditch*, 778 F.2d at 139. Absent evidence that more extensive consultations about collective bargaining agreements occurred, there is no basis for concluding that Cotter controlled or manipulated collective bargaining to an extent suggestive of joint employer status.

The union argues, and I agree, that Cotter was involved in the day-to-day supervision and direction of the drivers.[9] For example, Cotter dispatched drivers, instructed drivers on various aspects of their jobs, and held bi-annual safety meetings. Further, Cotter determined the number of runs needed per day, although route assignments were made according to seniority.

Cotter's supervision of the drivers is one factor that tends to support a finding of joint employer status. However, this factor is not determinative. *Clinton's Ditch*, 778 F.2d at 141 (Second Circuit held that no joint employer status existed where employer hired, fired and disciplined employees, although the contracting company supervised employees and participated in collective bargaining to a limited degree); *See also TLI, Inc.*, 117 L.R.R.M. (BNA) 1169 (N.L.R.B.1984), *enforced by, General Teamsters Union 326 v. Crown Zellerbach*, 772 F.2d 894 (3d Cir.1985) (board refused to find joint employer status where employer hired, fired, and controlled the collective bargaining process, even though contracting company supervised employees); *Laerco*, 269 NLRB 324 (1984). Although Cotter may have exercised some control over the driver's day-to-day activities, when considered with Cotter's lack of hiring, firing, disciplinary and negotiating authority, Cotter did not affect the terms and conditions of employment to such a

---

**9.** The company admits that "there was a strong functional relationship between Cotter and the drivers ... there is no question that the drivers received functional work directions and instructions from Cotter supervisory personnel." (Defendant Cotter's reply to plaintiff union's summary judgment motion at 7–8).

degree that it may be deemed a joint employer.

### III. CONCLUSION

In light of Cotter's lack of authority over hiring and firing, discipline, collective bargaining, and payment of wages, I am compelled to hold that Cotter and Mack are not joint employers. Therefore, Cotter is not a party to the collective bargaining agreement between Mack and Local 773 and cannot be forced to arbitration in accordance with this agreement. I will grant defendant's motion for summary judgment and deny plaintiff's.