929 F.2d 814
 55 Fair Empl.Prac.Cas. 861,
56 Empl. Prac. Dec. P 40,659
Juan Muller RIVAS, et al., Plaintiffs, Appellants,
v.
FEDERACION de ASOCIACIONES PECUARIAS de PUERTO RICO, d/b/a
Federacion Pecuarias de Mayaguez, Defendant, Appellee.
 No. 90-1721.
 United States Court of Appeals,
First Circuit.
 Heard Nov. 7, 1990.
Decided March 29, 1991.
 
 Federico Lora Lopez with whom Jose E. Carreras Rovira, was on brief, for plaintiffs, appellants.
 Enrique J. Mendoza Mendez with whom Roy J. Cohen and Law Offices of Roy J. Cohen, were on brief, for defendant, appellee.
 Before CAMPBELL, TORRUELLA and CYR, Circuit Judges.
 LEVIN H. CAMPBELL, Circuit Judge.
 
 
 1
 Plaintiffs-appellants appeal from the judgment of the district court dismissing this age discrimination case. The district court granted defendant-appellee's "Motion for Summary Judgment" and denied plaintiffs-appellants' "Motion to Alter or Amend Judgment." Plaintiffs-appellants are stevedores and hatchtenders as well as foremen, all of whom are over forty years of age, who worked loading and unloading ships in the Port of Mayaguez, Puerto Rico. They filed this lawsuit against Federacion de Asociaciones Pecuarias de Puerto Rico ("FAP"), asserting claims for dismissal and refusal to hire because of age under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. Sec. 623(a),[1] and also asserted a pendent claim under Puerto Rico's age discrimination law, Puerto Rico Law No. 100 of June 30, 1959, as amended, 29 L.P.R.A. Sec. 146 et seq. ("Law 100").
 
 
 2
 FAP, which operates grain mills for farm animal feed manufacturing in the Port of Mayaguez, moved for summary judgment on the grounds, inter alia, that plaintiffs failed to state a cause of action because FAP was not plaintiffs' employer. Rather, FAP maintains that Antilles Shipping Company ("Antilles"), with whom FAP contracted to provide unloading services, was plaintiffs' exclusive employer. FAP asserts that it never employed stevedores, hatchtenders or foremen prior to April 1988, relying until that time on services provided by Antilles. FAP acknowledges that, after concluding it could conduct unloading operations in-house for a lesser price per unloaded ton, it terminated its contract with Antilles in April 1988 and hired and supervised its own stevedores and hatchtenders.
 
 
 3
 In its "Motion Presenting Additional Ground for Summary Judgment" filed below, FAP contended that plaintiffs were simply disinclined to seek employment with it in April 1988 at the wages then offered (wages which FAP specifically offered to plaintiffs in the Equal Employment Opportunity Commission ("EEOC") administrative procedures). FAP's refusal to employ them at the higher wages provided in their collective bargaining agreement with Antilles did not, therefore, constitute age discrimination.
 
 
 4
 Plaintiffs filed no formal response in the district court to FAP's "Motion Presenting Additional Ground for Summary Judgment."[2] On appeal, however, plaintiffs argue that a cost justification for FAP's treatment of them is not a legitimate defense to their age discrimination claim. Plaintiffs also insist that FAP had exercised such control over them prior to April 1988 as to have been their joint employer.
 
 
 5
 After receiving depositions, an affidavit and related materials, and after conducting a hearing, the district court concluded, in essence, that plaintiffs had not shown a genuine issue of material fact concerning whether defendant was plaintiffs' joint employer. Rather, as a matter of law, the court ruled that defendant was not a joint employer. In support of this conclusion, the district court stated:
 
 
 6
 [T]he record has established that plaintiffs were employed by Antilles; they were paid by Antilles; their work assignment was controlled by Antilles; and their personnel decisions involved only Antilles for the [Collective Bargaining Agreement] was between Antilles and plaintiffs. The foremen who supervised the employees were hired by Antilles. Therefore, plaintiffs have failed to show that FAP exercised a significant control over the work of plaintiffs, who are employees of Antilles, or that FAP shared or co-determined with Antilles those matters governing the essential terms and conditions of employment.
 
 
 7
 The district court thereupon dismissed plaintiffs' complaint. Plaintiffs moved, thereafter, to alter or amend judgment on the grounds that the district court's resolution of the "joint employer" issue did not justify its dismissal of their alternate claim of a discriminatory refusal to hire. The district court denied the motion, stating: "Due to our findings and conclusion [that defendant was not plaintiffs' joint employer], the present case cannot continue on the issue of adverse impact on defendant's hiring practice...."
 
 
 8
 On appeal, plaintiffs make two arguments: (1) the district court erred in finding that no genuine issue of material fact exists as to whether FAP is the plaintiffs' employer; and (2) the district court erred in dismissing, based on a determination that FAP is not plaintiffs' employer, plaintiffs' hiring discrimination claim. We agree with the district court that, on the showing made, FAP was not plaintiffs' joint employer. Additionally, plaintiffs made no showing that FAP discriminated against them in hiring, whether on the basis of age or any other factor. We, therefore, affirm.
 
 BACKGROUND
 
 9
 Antilles is a ships' agent in Puerto Rico which is owned and operated independently from FAP. Antilles provides services, including loading and unloading services, in the Port of Mayaguez, for as many as thirty or forty principals. Antilles also solicits incoming and outgoing freight for vessels for as many as three hundred clients. Antilles had a longstanding relationship to provide services to FAP since the inception of FAP's grain mill in the Port of Mayaguez. Antilles and FAP entered into a letter agreement on July 11, 1972[3] whereby Antilles would make arrangements for port clearance and berthage of vessels at the FAP pier and would "furnish and supervise" both line handlers to stabilize the vessels in front of FAP's pier and laborers to unload the vessels. The Antilles work gangs, including deck hands, those working in the cargo holds, and foremen, worked in conjunction with FAP's directly-employed equipment operators to unload the ships.
 
 
 10
 Under the agreement between Antilles and FAP, FAP would advise Antilles twenty-four hours in advance of the time a gang should report for work. Antilles would then make arrangements to engage the gangs of laborers that FAP had ordered, and would pay the laborers at the end of the work shift. FAP paid Antilles on a "cost plus" basis.[4] Antilles agreed to carry worker's compensation insurance, as well as specified amounts of public liability, employer's and property damage insurance. These costs, together with laborers' wages and other approved miscellaneous out-of-pocket expenses would be reimbursed by FAP,[5] and Antilles would be paid an additional fee of twenty to thirty cents per short ton of cargo unloaded.[6]
 
 
 11
 The plaintiffs, who constituted the Antilles gangs working at FAP, are members of the Union de Trabajadores de Muelles ("UTM"), Locals 1902 and 1904, and the Asociacion Insular de Capataces de Muelles, which groups foremen (or "capataces") and stevedores, respectively.[7] Plaintiff Juan Muller Rivas estimated at his deposition that only eighty percent of the union members were over forty years of age, and there is no evidence that FAP treated the older union members any differently from the younger members. Throughout this period, UTM entered into three-year collective bargaining agreements with the Association of Steamship Agencies ("Association"), of which Antilles is a member. The Association is an umbrella organization composed of representatives of companies which have an interest in the operation of all of the ports in Puerto Rico, including ships' agents, refineries and cruise ships. On July 10, 1987 the Association and UTM amended the collective bargaining agreement, which applied to all bulk cargo clients, to explicitly provide that FAP, among others, was bound by the agreement's work conditions provisions, including wages and number of workers to be assigned to each gang. Antilles' procedures for ordering the work gangs to work on FAP vessels were governed by the collective bargaining agreement.[8]
 
 
 12
 Antilles provided unloading services to FAP until April 1988. At that time, FAP discontinued its relationship with Antilles because it found that it could arrange for its own unloading at lower cost. According to Fyffe, if FAP, or any other Antilles client, wished to pay less than the rate agreed in the collective bargaining agreement, Antilles had no choice but to refuse to serve that client. According to the FAP Comptroller, Jose Manuel Del Valle Bras, since the termination of its relationship with Antilles, FAP uses approximately nine temporarily-employed persons per day for unloading vessels among a total pool which, according to the lists FAP provided to plaintiffs, numbered 49 in 1988 and 58 in 1989.[9]
 
 
 13
 Beginning on or about April 1988, FAP no longer allowed the union gangs from Antilles, of which plaintiffs were a part, to enter the FAP facility. According to plaintiff Juan Muller Rivas, security guards deprived plaintiffs of access to FAP's facility after termination of the Antilles arrangement. Plaintiff Juan Muller Rivas, at his deposition, said that FAP simply stopped having plaintiffs called to work, and conceded that he did not ask for a job at FAP, explaining only that security guards prevented entry. There is no evidence that plaintiffs ever inquired about positions as nonunionized laborers, in person or by mail or telephone.[10] FAP maintains that no plaintiffs applied for new positions as of April 1988 and plaintiffs specify no occasion on which any of them attempted to do so. Further, according to plaintiff Muller Rivas, the Starkist, Bumble Bee and Neptune Packing tuna facilities also directly hired its own nonunionized laborers. He said some of the younger union members, who could "stand the cold," worked for the tuna companies too, which, according to Muller Rivas, pay wages lower than those provided in the collective bargaining agreement.
 
 
 14
 According to FAP's Comptroller Jose Manuel Del Valle Bras, the plaintiffs are qualified for the unloading work but FAP did not hire them at the higher union wage because, in Del Valle's words: "It's too costly for us" and for "no other reason." Del Valle explained that FAP's cost of unloading with Antilles was approximately four dollars fifty-five cents ($4.55) per unloaded ton of ingredient and the cost of the subsequent in-house operation is approximately one dollar ($1.00) per unloaded ton.[11] Under the collective bargaining agreement, and without regard to their age, plaintiff stevedores were earning $6.91 per hour and plaintiff foremen were earning $7.25 per hour for their work at FAP through Antilles, in addition to fringe benefits. After termination of the Antilles relationship, FAP paid the directly hired employees the minimum wage, $3.35 per hour, in 1988 and 1989.[12] In fact, FAP offered, as part of the administrative procedures at the Equal Employment Opportunity Commission, to pay this rate to plaintiffs interested in continuing to work at FAP. This offer was refused.[13]
 
 DISCUSSION
 A. Joint Employer
 
 15
 Reviewing de novo the district court's grant of FAP's summary judgment motion and viewing the record in the light most favorable to the nonmovant plaintiffs in this age discrimination case, Olivera v. Nestle Puerto Rico, Inc., 922 F.2d 43, 44-45 (1st Cir.1990), we conclude, as did the district court, that FAP was not plaintiffs' joint employer. In the labor relations context,[14] the Supreme Court, in Boire v. Greyhound Corp., 376 U.S. 473, 480-81, 84 S.Ct. 894, 898, 11 L.Ed.2d 849 (1964), recognized as an issue of fact whether an entity possesses sufficient indicia of control over employees so as to constitute a "joint employer" under Sec. 9(c) of the NLRA, 29 U.S.C. Sec. 159(c).[15] The joint employer inquiry,[16] "is a matter of determining which of two, or whether both, respondents control, in the capacity of employer the labor relations of a given group of workers." NLRB v. Browning-Ferris Industries of Pennsylvania, Inc., 691 F.2d 1117, 1122-23 (3d Cir.1982) (citing NLRB v. Condenser Corp. of America, 128 F.2d 67, 72 (3d Cir.1942)).[17] See Boire, supra.
 
 
 16
 The courts of appeals have emphasized a number of considerations relevant to the factual determination of whether an entity exercised sufficient control over employees to constitute a joint employer. The Seventh Circuit has noted the relevance of "such factors as the supervision of the employees' day to day activities, authority to hire or fire employees, promulgation of work rules and conditions of employment, work assignments, and issuance of operating instructions." G. Heileman Brewing Co., Inc. v. NLRB, 879 F.2d 1526, 1531 (7th Cir.1989) quoting W.W. Grainger, Inc. v. NLRB, 860 F.2d 244, 247 (7th Cir.1988). The Fifth Circuit, in finding a company was a joint employer, noted: "[The company had] the right to approve employees, control the number of employees, have an employee removed, inspect and approve work, pass on changes in pay and overtime allowed. In practice [the company] exercised its control, though in varying degrees." Ref-Chem Co. v. NLRB, 418 F.2d 127, 129 (5th Cir.1969). See also Clinton's Ditch Co-op Co., Inc., v. NLRB, 778 F.2d 132, 138-39 (2d Cir.1985), cert. denied, 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986) (emphasizing five factors: (1) hiring and firing; (2) discipline; (3) pay, insurance and records; (4) supervision; and (5) participation in the collective bargaining process); Browning-Ferris, 691 F.2d at 1124-25 (Third Circuit discussion of evidence on which joint employer finding was appropriate); NLRB v. Checker Cab Co., 367 F.2d 692, 698, cert. denied, 385 U.S. 1008, 87 S.Ct. 715, 17 L.Ed.2d 546 (1967) (Sixth Circuit reciting evidence sufficient to find joint employer).
 
 
 17
 Here, plaintiffs emphasize, in particular, that FAP controlled the work schedule under the 1972 FAP-Antilles contract, and testimony of Antilles' Paymaster Braulio that FAP supervisory personnel were responsible for disciplining the gang foremen and that FAP's personnel directed the unloading operation. We do not think that this is enough to sustain a finding that FAP was plaintiffs' employer. To be sure, FAP retained control over setting the time that its ships were to be unloaded, may have had some work-site disciplinary authority over the gang foremen, and ultimately directed the order of what was to be unloaded first. Yet, the laborers were selected and scheduled by Antilles according to procedures dictated by the collective bargaining agreement between Antilles and UTM, which mandated that gang selection be based, at least in part, on seniority. Beyond the paymaster's general statement that FAP disciplined the gang foremen, the 1972 contract provided that Antilles was obligated to "furnish and supervise" the laborers, Antilles' Mr. Fyffe testified to handling disciplinary problems through the foreman and the union, and Antilles, rather than FAP, was involved in the formal union disciplinary grievance procedure. Moreover, FAP's Comptroller Del Valle Bras testified at his deposition that FAP's supervision of the gangs amounted to merely deciding which materials were to be unloaded first. In addition, it is undisputed that Antilles, as a member of the Association, rather than FAP, conducted the collective bargaining negotiations with UTM and that Antilles paid the plaintiffs from a separate payroll.[18] We do not think the evidentiary materials, construed most favorably to plaintiffs, would allow a conclusion that FAP exercised sufficient control over the essential terms of plaintiffs' employment to constitute a joint employer under the ADEA.
 
 B. Refusal to Hire
 
 18
 Plaintiffs have failed to make out a case of age discrimination in hiring. FAP simply terminated its relationship with Antilles and thereby was released from its obligation to compensate plaintiffs, via Antilles, according to the terms of the collective bargaining agreement between Antilles and plaintiffs' union, UTM. Having terminated the Antilles relationship, FAP was then at liberty to offer to hire stevedores, hatchtenders and foremen at whatever wage it saw fit.
 
 
 19
 To be sure, economic savings from discharging older employees is not a legitimate business justification under the ADEA, 29 U.S.C. Sec. 623(f)(1). See EEOC Guidelines, 29 C.F.R. Sec. 1625.7(f) ("A differentiation based on the average cost of employing older employees as a group is unlawful except with respect to employee benefit plans which qualify for the section 4(f)(2) exception to the Act."); see, e.g., Metz v. Transit Mix Inc., 828 F.2d 1202 (7th Cir.1987); Leftwich v. Harris Stowe State College, 702 F.2d 686, 692 (8th Cir.1983). But, as the Sixth Circuit has stated:
 
 
 20
 age discrimination could be avoided by allowing the older manager to compete equally for the job, at the lower wage rate. By offering the job to older employees on the same terms as younger, the employer would demonstrate that the employment practice is the cost-saving measure it purports to be and not a pretext for age discrimination.
 
 
 21
 Abbott v. Federal Forge, Inc., 912 F.2d 867, 876 (6th Cir.1990) (footnote omitted) (emphasis in original) (citing Metz, 828 F.2d at 1208-10). See also Davidson v. Board of Gov. of State Colleges and Univ. for Western Illinois University, 920 F.2d 441, 446 (7th Cir.1990) (compensation scheme under which younger and less experienced new faculty members were paid higher salaries than older faculty members due to their respective "market" value, was not discriminatory).
 
 
 22
 Here, FAP did not discharge employees. Rather, once no longer encumbered by Antilles' obligations under the collective bargaining agreement, FAP simply offered directly hired employees lower wages than were paid to the contractor's (Antilles) employees for the same work. There is no evidence on the record that FAP discriminated against plaintiffs, who were in fact Antilles employees, in hiring at the new, albeit lower, wage, nor is there evidence that FAP refused to consider plaintiffs seeking these positions. There is no evidence that FAP imposed any age-based requirements on employees hired after April 1988 or considered factors other than their willingness to accept the $3.35 per hour wage offered. Indeed, in the context of the EEOC administrative procedures, plaintiffs were offered but refused employment at the lower wage. One may sympathize with plaintiffs who faced a decrease in wages for work at FAP. But their unwillingness to accept the decrease, even if motivated by their status as older and more experienced workers and an expectation of earning their former union wage for the exact same work,[19] does not translate into age discrimination on the part of FAP. The ADEA imposes no independent obligation on FAP to hire plaintiffs, even if older and more experienced, at a higher wage than other young or old applicants.
 
 
 23
 Affirmed. Costs to Appellees.
 
 
 
 [1]
 The ADEA, 29 U.S.C. Sec. 623(a), provides:
 It shall be unlawful for an employer--
 (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
 (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
 (3) to reduce the wage rate of any employee in order to comply with this chapter.
 
 
 [2]
 Pursuant to District of Puerto Rico Local Rule 311.12, all uncontroverted material facts set forth in FAP's "Motion Presenting Additional Ground for Summary Judgment" must be deemed admitted. Although asserted in that motion and not controverted below, plaintiffs now dispute FAP's claim that, during the EEOC administrative procedures, it offered plaintiffs an equal opportunity to work at the prevailing in-house wage rate, which offer was refused. See infra note 13
 
 
 [3]
 According to its terms, the letter agreement was to be "in full force and effect, until notice is sent by Register Mail ... ninety (90) days in advance of the date of intent to terminate the agreement...." While Antilles' Vice-President for Operations, Roberto Fyffe, testified at his deposition that the agreement between Antilles and FAP was verbal and not written, it appears that this letter agreement was in force at the time relevant here
 
 
 [4]
 According to Antilles, all of its bulk cargo clients were charged on such a "cost plus" basis
 
 
 [5]
 The agreement specifically stated that FAP "will also pay the direct cost of labor as provided in the collective bargaining agreement attached." A list of benefits was attached to the contract
 
 
 [6]
 Antilles' Vice-President for Operations, Roberto Fyffe, testified in his deposition that Antilles would coordinate with FAP to keep track of the times of arrival for vessels carrying cargo from their piers, and would then order gangs of stevedores to unload the vessel upon arrival. Antilles would provide an invoice to FAP indicating the basis for the laborers' salary, the gross salary, fringe benefits such as social security, unemployment, worker's compensation and other insurance coverage, a welfare fund, vacation fund, and Christmas bonus, plus Antilles' fee per ton. Fyffe explained that the parties would discuss and adjust the amount of the "plus" fee from time to time, and Antilles would verbally notify FAP of changes in "cost" expenses, which were all passed through
 
 
 [7]
 According to plaintiff Juan Muller Rivas, the foremen's union is affiliated with UTM, but has a separate administration and had a separate collective bargaining agreement. Plaintiffs assert in their brief on appeal, however, that all are members of UTM, which apparently had a single collective bargaining agreement. The record does not reflect distinctions between the terms of the collective bargaining arrangements for the two groups that would be relevant to this case, and we refer to UTM as the union for all of the plaintiffs, including foremen
 
 
 [8]
 Specifically, the collective bargaining procedures for ordering the work gangs relate to the amount of time before an operation that a gang must be ordered and the time after which a gang order cannot be cancelled without incurring a four hour wage charge. The collective bargaining agreement also mandated that Antilles would follow a procedure for selecting gangs based, at least in part, on seniority
 The union also played a significant role in other areas of the plaintiffs' work conditions. Plaintiff Juan Muller Rivas, at his deposition, testified that the union representatives, including Jorge Aponte Figueroa, would deliver bonuses and other benefits to the laborers. Muller Rivas said that welfare bonus checks listed hours worked for FAP as well as those worked for other companies for whom work had been done such as another ships' agent similar to Antilles, Alemany and Marti.
 Further, Antilles' Roberto Fyffe, at his deposition explained that, for those disciplinary problems with particular laborers about which he was contacted, he proceeded through the union. In a case where FAP was dissatisfied with a particular laborer, FAP would contact Fyffe, who would then contact the president of the union in San Juan. Antilles' Paymaster, Jose Hiram Braulio, however, testified that the plaintiff foremen of the work gangs were in charge of disciplinary problems, and FAP supervisory personnel were responsible for disciplining the gang foremen. Braulio also explained that an aggrieved laborer could go to the union. Braulio finally explained that, under the collective bargaining agreement, disciplinary problems could ultimately be taken to the grievance committee, which was composed of two union representatives, two Antilles representatives, and, if necessary, one person from the Department of Labor. According to Braulio, however, this grievance committee was never utilized.
 
 
 [9]
 According to Antilles' Paymaster Braulio, he and plaintiffs (but not foremen) also worked for another ships' agent, Alemany & Marti. Braulio explained that Antilles and Alemany & Marti each selected its own foremen which did not work for both. Braulio said Alemany & Marti had the same collective bargaining agreement with UTM as Antilles
 
 
 [10]
 Contrary to plaintiffs' assertion in their brief that they applied for the job for which FAP was seeking applicants, plaintiff Juan Muller Rivas specifically conceded at his deposition that he had not asked for a job at FAP "because they have a security system at their facilities and nobody can go in."
 
 
 [11]
 Plaintiff Mario Morales Alvarez stated in an affidavit, however, that FAP supervisor Felix Rosario had threatened to discharge plaintiffs because of their age and that Rosario commented: "These useless old men must be taken out of here because they are not worth a brown penny." While evidence of motivation, this evidence is not significant in the absence of any actual discriminatory action against plaintiffs
 
 
 [12]
 FAP offered additional minor "shift differentials" of fifteen and thirty cents to compensate workers for taking evening and night shifts
 
 
 [13]
 Plaintiffs contend that this settlement offer would be inadmissible at trial and should therefore be disregarded. However, plaintiffs themselves raised the settlement offer in the record in their "Motion in Opposition to Summary Judgment" and their "Motion to Alter or Amend Judgment." Furthermore, FAP submitted letters communicating the offer and subsequent refusal with its "Motion Presenting Additional Ground for Summary Judgment," to which plaintiffs failed to respond. Plaintiffs having failed to object to consideration of this evidence in the district court, we decline to consider such an objection on appeal, and deem the facts of the offer and refusal admitted. See District of Puerto Rico Local Rule 311.12
 
 
 [14]
 The statutory definition of "employer" under the ADEA provides little guidance to our inquiry here. The statute defines "employer" to mean, in pertinent part:
 a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.... The term also means (1) any agent of such a person....
 29 U.S.C. Sec. 630.
 
 
 [15]
 The definition of employer under the NLRA has since been extended to the civil rights context,
 [s]ince it is clear that the framers of Title VII used the NLRA as its model, we find the similarity in language of the Acts indicative of a willingness to allow the broad construction of the NLRA to provide guidance in the determination of whether, under Title VII, two companies should be deemed to have substantial identity and treated as a single employer.
 Armbruster v. Quinn, 711 F.2d 1332, 1336 (6th Cir.1983) (citations omitted). See also Teamsters v. United States, 431 U.S. 324, 366, 97 S.Ct. 1843, 1870, 52 L.Ed.2d 396 (1977). As the substantive provisions of the ADEA were derived in haec verba from Title VII, Lorillard v. Pons, 434 U.S. 575, 584 & n. 12, 98 S.Ct. 866, 872 & n. 12, 55 L.Ed.2d 40 (1978), as was the statutory definition of "employer," (which relates to the scope of the law's substantive provisions), we may look to constructions of the term in the Title VII (and thus the NLRA) context for guidance. See Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 395 n. 11, 102 S.Ct. 1127, 1133 n. 11, 71 L.Ed.2d 234, rehearing denied, 456 U.S. 940, 102 S.Ct. 2001, 72 L.Ed.2d 461 (1982) (ADEA modeled after Title VII); see also EEOC v. Zippo Mfg. Co., 713 F.2d 32, 36 (3d Cir.1983); cf. Oscar Mayer & Co. v. Evans, 441 U.S. 750, 755-56, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979).
 
 
 [16]
 The courts, in the Title VII context, have inappropriately used the terms "single employer" and "joint employer" interchangeably, which in fact refer to two distinct concepts. These distinctions are thoroughly discussed in NLRB v. Browning-Ferris Industries of Pennsylvania, Inc., 691 F.2d 1117, 1123 (3d Cir.1982). The "single employer" inquiry, not applicable here, involves the question of whether two allegedly separate business enterprises should in fact be treated as a single entity. In Radio and Television Broadcast Technicians Local 1264 v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965), the Supreme Court recognized the validity of the National Labor Relations Board's approach in a labor dispute to determining whether various business entities constitute a "single employer" by considering whether they "comprise a single enterprise." Id. The Supreme Court set out the standard for the "single employer" inquiry as follows: "[I]n determining the relevant employer, the [National Labor Relations] Board considers several nominally separate business entities to be a single employer where they comprise an integrated enterprise.... The controlling criteria ... are interrelation of operations, common management, centralized control of labor relations and common ownership." Radio & Television Broadcast Technicians, 380 U.S. at 256, 85 S.Ct. at 877 (citations omitted). See also McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 933 (11th Cir.1987); EEOC v. Wooster Brush Company Employees Relief Ass'n, 727 F.2d 566, 571-73 (6th Cir.1984); Trevino v. Celanese Corp., 701 F.2d 397, 403, rehearing denied, 707 F.2d 515 (5th Cir.1983); Baker v. Stuart Broadcasting Co., 560 F.2d 389 (8th Cir.1977). The Radio & Television factors that have consistently been applied to the "single employer" inquiry are not relevant to our "joint employer" inquiry in this case
 
 
 [17]
 The Browning-Ferris court described the "joint employer" concept more fully as follows:
 The basis of the finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus, the "joint employer" concept recognizes that the business entities involved are in fact separate but that they share or co-determine those conditions of employment. C.R. Adams Trucking, Inc., 262 NLRB No. 67, June 30, 1982, slip op. at 5; Ref-Chem Co. v. NLRB, 418 F.2d 127, 129 (5th Cir.1969); NLRB v. Greyhound Corp., 368 F.2d 778, 780 (5th Cir.1966).
 Browning-Ferris, 691 F.2d at 1123.
 
 
 [18]
 Roberto Fyffe testified at his deposition that he negotiated the collective bargaining agreement with the union on behalf of Antilles as a member of the Association every three years. Plaintiffs note that the Antilles representative advised FAP of the terms of the collective bargaining agreement, such as wage levels, before signing the agreement. But there is no evidence that Antilles was acting as FAP's agent or alter ego in these negotiations
 Plaintiffs further assert that the FAP Comptroller Del Valle Bras conceded that he "signed with the union." While Del Valle Bras, in the context of explaining that FAP was obliged to accept laborers through Antilles on the terms of the collective bargain agreement stated, "I signed with the union," there is no evidence of what he signed, as FAP is not a signatory to the collective bargaining agreement itself. In fact, it is unclear exactly what Del Valle Bras meant when making this statement.
 
 
 [19]
 Plaintiffs' plight is revealed in their "Motion to Alter or Amend Judgment": "Clearly to ask a worker to accept $3.35 an hour when he has earned over $8.00 an hour for the same job, cannot be reasonably conceived as 'equal opportunity.' " Though plaintiffs were paid approximately $7.00 per hour in 1988, according to plaintiff Juan Muller Rivas, they had been paid as much as $9.00 per hour in 1983 or 1984