**HOLYOKE VISITING NURSES ASSOCIATION and O'Connell Professional Nurse Service, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 93–1507.

United States Court of Appeals, First Circuit.

Heard Oct. 5, 1993.

Decided Dec. 17, 1993.

Albert R. Mason, Chicopee, MA, for petitioners.

John D. Burgoyne, Asst. Gen. Counsel, N.L.R.B., with whom Jerry M. Hunter, Gen. Counsel, Yvonne T. Dixon, Acting Deputy Gen. Counsel, Nicholas E. Karatinos, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, DC, were on brief, for respondent.

Before TORRUELLA, Circuit Judge, ROSENN,* Senior Circuit Judge and STAHL, Circuit Judge.

ROSENN, Senior Circuit Judge.

Holyoke Visiting Nurses Association (Holyoke) and O'Connell Professional Nurse Service, Inc. (O'Connell, Inc.) (collectively, the Petitioners) seek review of an order of the National Labor Relations Board (the Board) which required them to cease and desist from unfair labor practices and from infringing upon their employees' Section 7 rights under the National Labor Relations Act as amended (the Act), 29 U.S.C. § 151 et seq., to make employee Eileen Bourque whole for any loss of earnings suffered by her, and to post an appropriate notice.[1] The Board cross-applies for enforcement of its order against the Petitioners. We deny the Petitioners' petition for review, and we grant the Board's cross-application for enforcement against the Petitioners.

## I.

Holyoke, a private, non-profit organization, provides nursing services, home health aide, homemaker, and hospice care to people in their own homes. Holyoke's employees are represented for purposes of collective bargaining by Service Employees International Union, Local 285 (the Union). Holyoke's activities are directed by its Director of Hospice, Patricia Cavanaugh.

O'Connell, Inc. is a referral agency that supplies nurses and licensed practical nurses to hospitals and other institutions on a per diem or hourly rate basis. The activities of O'Connell, Inc. are directed by its president and sole stockholder, Francis O'Connell. O'Connell, Inc. hires the nurses and licensed practical nurses, carries insurance on them, sets their wage rates, and pays them for their work, making appropriate deductions for taxes. O'Connell, Inc.'s employees are not represented by a union and do not participate in any collective bargaining.

The Petitioners have a written contract under which O'Connell, Inc. makes its nurse employees available to Holyoke as needed and Holyoke reimburses O'Connell, Inc. for their services at a specified hourly rate. Typically, the nurses supplied arrive at Holyoke's office in the morning where Holyoke supervisors give them a list of patients that they are to attend, a report on the patients' conditions, and directions to the patients' homes. Holyoke supplies the persons referred with a visiting nurse bag containing a stethoscope and blood pressure cup. The nurses take the same breaks as Holyoke employees and frequently eat lunch with them. If a problem arises during the day, the referred employees contact their Holyoke supervisor. After making their rounds and before leaving for the day, they report to one of the Holyoke supervisors to discuss the patients and file written reports which be-

---

* Of the Third Circuit, sitting by designation.

1. The Board had jurisdiction over this matter under section 10(a) of the Act, 29 U.S.C. § 160(a), and we have jurisdiction over this appeal pursuant to 29 U.S.C. § 160(e).

come the property of Holyoke. Holyoke supervisors make decisions concerning the continued use of referred nurses based on need and the feedback that they receive from patients and staff. If a referred nurse does not meet Holyoke's standards, Holyoke has the authority to reject that person in the future.

In late 1990 and early 1991, Holyoke and the Union renegotiated their collective bargaining agreement. One of the issues was the security maintained by Holyoke in its parking lot. The area surrounding the parking lot had become dangerous because of nearby drug dealing and prostitution, and two Holyoke nurses had been assaulted there. In January, 1991, Holyoke employees voted to engage in a practice called "work to rule" in order to support their contract demands. That is, as a show of solidarity, they decided to arrive as a group at 8:00 a.m., take their breaks together, and leave as a group at 4:30 p.m.

On a number of occasions in 1990 and 1991, O'Connell, Inc. referred Eileen Bourque, a registered nurse employed by it, to Holyoke. Initially, Bourque frequently arrived for work 15 or 20 minutes prior to her 8:00 a.m. starting time and waited outside until a Holyoke employee arrived to open the building. After the assaults in the fall of 1990, however, Bourque stayed in her car until another person arrived. In January, 1991, Bourque overheard Holyoke employees talking about their intention to arrive for work as a group at 8:00 a.m. Because of her safety fears, Bourque ceased coming to work early and instead arrived for work at 8:00 a.m. to enter the building with the Holyoke nurses. One day, Holyoke Director Cavanaugh watched the staff enter the building and saw Bourque walk in with the group. Suspecting that Bourque was joining forces with the Holyoke nurses in their union activities, Cavanaugh telephoned O'Connell and complained about Bourque.

Shortly thereafter, Bourque became sick and was unable to work from January 17 to February 5, 1991. Upon her return, she was told to meet with O'Connell. At the meeting, O'Connell informed Bourque that she had been observed walking into the Holyoke office with the nurses who were in a "work to rule" protest, that Cavanaugh believed that such action was a demonstration of Bourque's allegiance for the Union, and that Cavanaugh had requested that she not be reassigned to Holyoke. Bourque explained to O'Connell that she entered the building with the Holyoke nurses for safety and security reasons, and that she had not taken part in any union activity. O'Connell replied that he would relate Bourque's explanation to Cavanaugh, but advised Bourque that Holyoke was his bread and butter and if Cavanaugh wanted to stand by her decision, she did not have to give him any reason for rejecting a referred employee. O'Connell further cautioned Bourque that she should remain neutral and uninvolved with the Holyoke employees. A week later, O'Connell informed Bourque that Cavanaugh understood the safety issue, and that everything was back to normal. Bourque was again referred to Holyoke on February 19, 1991.

Subsequently, Bourque filed a charge with the Board and the Board's General Counsel issued a complaint. At a hearing before an administrative law judge (ALJ), he rendered a decision and recommended order holding that the Petitioners were joint employers under the Act. The ALJ also held that the Petitioners violated sections 8(a)(1) and (3) of the Act by threatening and denying employment to Bourque because of their mistaken belief that she had assisted Holyoke's employees in their protected and union activities. The Board adopted the recommendations of the ALJ and ordered the Petitioners to cease and desist from the unfair labor practices found and from infringing upon their employees' Section 7 rights.[2] The Board also required the Petitioners to make Bourque whole for any loss of earnings suffered by her and to post an appropriate notice.

2. The Board modified the ALJ's recommended Order to provide that the statements made by O'Connell to Bourque concerning her involvement with the Union violated section 8(a)(1) of the Act.

## II.

The Petitioners essentially raise two issues on appeal. First, they contend that the Board erred in holding that they are joint employers of the employees referred by O'Connell, Inc. to Holyoke. Second, the Petitioners argue that the Board erred in ruling that they violated sections 8(a)(1) and (3) of the Act by threatening and denying employment to Bourque.

### A. Joint Employers

■ A joint employer relationship exists where two or more employers exert significant control over the same employees and share or co-determine those matters governing essential terms and conditions of employment. *Rivas v. Federacion de Asociaciones Pecuarias de Puerto Rico,* 929 F.2d 814, 819–20 (1st Cir.1991); *see also NLRB v. Browning–Ferris Industries, Inc.,* 691 F.2d 1117, 1124 (3d Cir.1982). Whether an employer possesses sufficient indicia of control to be an employer is essentially a factual issue. *Rivas,* 929 F.2d at 819–20 (citing *Boire v. Greyhound Corp.,* 376 U.S. 473, 480–81, 84 S.Ct. 894, 898–99, 11 L.Ed.2d 849 (1964)). Thus, the Board's finding of joint employer status is entitled to acceptance by this court if it is supported by substantial evidence on the record as a whole. *See NLRB v. Horizon Air Servs., Inc.,* 761 F.2d 22, 25 (1st Cir.1985).

This court has not set forth a specific test to use in evaluating whether a joint relationship exists. In *Rivas,* the court acknowledged that other courts have emphasized a number of relevant considerations. *Rivas,* 929 F.2d at 820–21. *See e.g., W.W. Grainger, Inc. v. NLRB,* 860 F.2d 244, 247 (7th Cir. 1988) (joint employment can be found from "such factors as the supervision of the employees' day-to-day activities, authority to hire or fire employees, promulgation of work rules and conditions of employment, work assignments, and issuance of operating instructions" and the right to refuse a referred employee); *Clinton's Ditch Cooperative Co. v. NLRB,* 778 F.2d 132, 138–39 (2d Cir.1985) (determination of joint employer status can be found from employer's power over hiring and firing; discipline; pay, insurance and records; supervision; and participation in

collective bargaining process), *cert. denied,* 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986); *Ref–Chem Co. v. NLRB,* 418 F.2d 127, 129 (5th Cir.1969) (joint employers found from evidence that company had right to approve employees, control number of employees, remove an employee, inspect and approve work, and pass on changes in pay and overtime allowed).

■ The Board's finding that Holyoke possessed sufficient control over the O'Connell, Inc. employees to be deemed a joint employer is supported by substantial evidence. First, Holyoke had the right to refuse to accept any employee that it did not want. The record shows that Holyoke monitored the performance of the referred employees and if an employee did not meet its standards, Holyoke could and did require that O'Connell, Inc. refrain from referring the employee again. The record further shows that O'Connell completely deferred to Holyoke's demands concerning which referrals would be accepted by Holyoke. In fact, Holyoke exercised its power in this case to refuse Bourque as a referral. Second, the record reveals that Holyoke assumed supervision over the referred employees. The referred employees reported to Holyoke's office where they were given certain supplies, the day's work assignment, a report on the patients' conditions, and directions to the patients' homes. If referred employees encountered a problem during the day, they were instructed to contact a Holyoke supervisor for advice. At the end of the day, the referred employees returned to the Holyoke office and made a written report to Holyoke of their activities. Moreover, the Petitioners acknowledge that in the eyes of their patients, the referred nurses were regarded as Holyoke employees.

The Petitioners argue that with professional personnel, by definition, there may be direction as to where to go, but no control or supervision as to "how" to do the assignment involved. They liken this case to the professional drivers discussed by the Board in *Laerco Transportation & Warehouse,* 269 NLRB 324, 1984 WL 36182 (1984), in which the Board found that Laerco's supervision over the referred employees was too routine

to make Laerco a joint employer. As discussed above, however, the supervision exercised by Holyoke over the O'Connell, Inc. referrals was more than routine. That the referred employees were professional nurses who may not have required much instruction as to how to perform their work does not negate the power of supervision and direction that Holyoke exercised over them once they reported for work.

More important than the factual distinctions between cases are the specific facts of this particular case. In *Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir.1985), the Sixth Circuit Court of Appeals rejected an argument identical to the one made here by Holyoke. The court found that the same cases cited by Holyoke[3] were not dispositive for two reasons.

> First, because the joint employer issue is simply a factual determination, a slight difference between two cases might tilt a case toward a finding of a joint employment.... Second, the only question before this Court is whether in this particular case there is substantial evidence to support the Board's finding that [the petitioner] was a joint employer. As we have discussed in the text, we believe there was ample evidence to support such a finding. Whether there could have been substantial evidence to support a finding of joint employment in the above-cited Board decisions is not an issue before the Court.

*Id.* at 781–82 n. 1. *Accord NLRB v. Western Temporary Servs., Inc.*, 821 F.2d 1258, 1267 n. 8 (7th Cir.1987).

In this case, the ALJ's finding that the Petitioners are joint employers, which was adopted by the Board, is supported by substantial evidence. Holyoke demonstrated its joint control of the referred employees by, *inter alia*, its unfettered power to reject any person referred to it by O'Connell, Inc., and its substantial control over the day-to-day activities of the referred employees. Thus, we see no error in the Board's finding that the Petitioners are joint employers of the employees referred by O'Connell, Inc. to work for Holyoke.

### B. Violation of the Act

■■■■ The Petitioners next contend that the Board erred in finding that they violated sections 8(a)(1) and (3) of the Act by threatening and denying employment to Bourque. Employers violate sections 8(a)(1) and (3) of the Act by threatening reprisals or discriminating against employees because they engage in union or other activities protected by the Act or are suspected of doing so. *See NLRB v. Horizon Air Servs., Inc.* 761 F.2d at 26 n. 2; *NLRB v. American Spring Bed Mfg. Co.*, 670 F.2d 1236, 1241–42 (1st Cir. 1982). Thus, proof of an unfair labor practice does not require proof of actual union activity; it is sufficient if the employer was motivated by suspected union activity in discharging the employee. *See e.g., McLane/Western, Inc. v. NLRB*, 827 F.2d 1423, 1425 (10th Cir.1987).

In this case, the Holyoke employees adopted the tactic of arriving for work together to support their position in ongoing contract negotiations. Bourque joined the group for safety reasons, not to support the Holyoke employees. Cavanaugh observed Bourque with the Holyoke employees and telephoned O'Connell to complain about Bourque's support for the Union. O'Connell informed Bourque of Cavanaugh's request that Bourque not return to Holyoke. When Bourque explained that she had joined the group for safety reasons, O'Connell replied that he would try to explain that to Cavanaugh, but that Cavanaugh did not have to give any reason for her request that Bourque not be reassigned. O'Connell advised Bourque that she should remain neutral and uninvolved with the Holyoke employees. O'Connell subsequently resolved matters with Cavanaugh and again referred Bourque to Holyoke.

At the hearing, both of the Petitioners denied that Cavanaugh had asked O'Connell to stop referring Bourque to Holyoke. The ALJ, however, found that "Bourque's testi-

---

**3.** *TLI Inc.*, 271 NLRB 798, 1984 WL 36756 (1984), *enforced without op., General Teamsters Local Union No. 326, etc. v. NLRB*, 772 F.2d 894 (3d Cir.1985); *H & W Motor Express, Inc.*, 271 NLRB 466, 1984 WL 36672 (1984); *Laerco*, 269 NLRB 324, 1984 WL 36182.

mony was candid and straightforward, and [his] observations of her demeanor convince[d him] that she was telling the truth in her descriptions of her conversations with O'Connell." The Board accepted the ALJ's credibility determinations.

■ The ALJ's credibility determinations are entitled to great weight since he saw and heard the witnesses testify. *Rikal, Inc. v. NLRB*, 721 F.2d 402, 406 (1st Cir.1983). As stated by this court in *American Spring Bed, supra,*

> The credibility of witnesses is for the ALJ to determine, and the reviewing court will set aside such findings only when he oversteps the bounds of reason. So long as the ALJ's position represents a choice between two fairly conflicting views, it should be enforced even if this court would justifiably have made a different choice had the matter come before it *de novo.*

670 F.2d at 1242 (citations omitted).

The Petitioners offer no proof that the ALJ's credibility findings are unreasonable. Thus, we accept the ALJ's findings that Holyoke requested O'Connell, Inc. not to refer Bourque because of Holyoke's erroneous belief that Bourque was assisting the unionized employees in their protected demonstration; that O'Connell, Inc. willingly complied with Holyoke's illegal request; and that O'Connell specifically cautioned Bourque not to involve herself with the demonstrating Holyoke employees. Once the ALJ's credibility findings are accepted, there is more than sufficient evidence to support the Board's ruling that the Petitioners both violated sections 8(a)(1) and (3) of the Act.

■ The final determination set forth by the ALJ and upheld by the Board relative to the unfair labor practices is as follows:

> The facts noted above, show that Bourque would have worked at least some of the days that [Holyoke] used referrals from O'Connell in the period between February 5, 1991, when Bourque was released by her doctor, and February 19, 1991 when she was actually assigned to [Holyoke]. The question of just how many days must wait until the compliance stage of this proceeding.

The Petitioners submit that the above conclusion is speculative and they set forth testimony that, they argue, shows that Bourque did not miss any days of work for Holyoke due to their actions.

To the contrary, the evidence creates an issue as to how many days, if any, Bourque would have been referred to Holyoke during the period that the Petitioners prevented her referral. Bourque testified that her schedule for working at Holyoke was arranged as far as three months ahead of time, or as short as the morning of work. In the past, she had been called the day before and even at 9:00 in the morning of the day she was to work. Therefore, the Board did not err in finding that Bourque may be entitled to backpay and that the amount of backpay owing to Bourque could be resolved, if necessary, in the compliance proceeding following enforcement of the Board's order.

This court has approved the same kind of order and procedure in a similar situation. In *NLRB v. Globe Mfg. Co.*, 580 F.2d 18, 21–22 (1st Cir.1978), where an employer had imposed a discriminatory recall policy on an employee, this court upheld a Board order leaving to compliance proceedings the resolution of whether the employee in fact would have been recalled in the absence of the illegal policy. The court noted that it could not rule on the company's claim that the employee was unemployable under the company's standards, and it refused to prolong the case by declining enforcement and remanding the case. *Id.* at 22. Rather, the court held that the Board's order would be enforced and the company would be entitled to present its proofs and seek to disprove both damages and a duty to reinstate. *Id. See also NLRB v. Plumbers & Pipefitters Local Union No. 403, etc.*, 710 F.2d 1418, 1420–21 (9th Cir.1983) (upholding Board order delaying until compliance proceedings determination of entitlement to, and amount of, back-pay awards for all possible victims of unfair labor practices engaged in by union); *NLRB v. International Assoc. of Bridge, etc.*, 600 F.2d 770, 778 (9th Cir.1979) (enforcing Board order calling for back-pay awards even when identity of all the discriminatees

was not known), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980).

### III.

The record contains substantial evidence to support the ALJ's findings, adopted by the Board, that the Petitioners are joint employers of the employees referred by O'Connell, Inc. to work for Holyoke, and that the Petitioners committed unfair labor practices under sections 8(a)(1) and (3) of the Act.

Accordingly, the petition for review is *denied* and the cross-application for enforcement is *granted.* Costs taxed against the Petitioners.