**LONGSTREET ASSOCIATES, L.P., Pembrook Management, Inc., and Corporate Property Investors, Plaintiffs,**

v.

**Gus BEVONA, President, Local 32B–32J, Service Employees International Union, and Realty Advisory Board On Labor Relations, Inc., Defendants.**

No. 98 Civ. 0128(BSJ).

United States District Court, S.D. New York.

Jan. 23, 1998.

Kelley Drye & Warren, Kenneth Kirschner, New York City, for Plaintiffs.

Raab & Sturm, L.L.P., Ira A. Sturm, New York City, for Defendants.

## OPINION & ORDER

JONES, District Judge.

This case involves the claims of sixteen security guards recently dismissed from their jobs at the General Motors Building in Manhattan. At issue, is the arbitrability of the security guards, claims under a Collective Bargaining Agreement ("RAB Agreement") between Local 32B–32J of the Service Employees International Union ("Union") and the Realty Advisory Board on Labor Relations, Inc. ("RAB"), of which Pembrook Management, Inc. ("PMI"), managing agent for Longstreet Associates, L.P. ("Longstreet"), is a signatory member.

Plaintiffs PMI, Longstreet, and Corporate Properties Investors ("CPI"), brought this action to enjoin an arbitration proceeding brought by the Union under the RAB Agreement. On January 9, 1998, the Court issued a Temporary Restraining Order staying arbitration, on January 13, 1998, the Court held an evidentiary hearing on plaintiffs' motion for a preliminary injunction, and on January 16, 1998, the Court heard oral argument.

Plaintiffs contend that the dismissed security guards were employed by a cleaning and maintenance contractor, and that they, therefore, are expressly excluded from coverage under the RAB Agreement. At first blush, this argument appears persuasive, and, in past cases in this Circuit, the same cleaning and maintenance exclusion has been found to justify a temporary injunction against arbitration, even in the face of the RAB Agreement's broad arbitration clause.

The Union, however, claims that the exclusion does not apply in this case because the security guards were employed not only by the cleaning and maintenance contractor, but also by PMI. Under this joint employer theory, the Union claims, the security guards are covered by the RAB Agreement.

For the following reasons, the Court agrees with the Union and concludes that plaintiffs are obligated to arbitrate under the RAB agreement. Accordingly, plaintiffs' motion for a preliminary injunction is denied

and the Temporary Restraining Order is dissolved.

## BACKGROUND[1]

The General Motors Building ("Building"), located at 767 Fifth Avenue in Manhattan, was purchased by CPI in 1991. At that time, CPI formed Longstreet to assume ownership of the Building, and designated PMI the Building manager.[2] Since 1991, all cleaning and maintenance work, as well as security work, has been contracted out by PMI to Temco Services Industries, Inc. ("Temco"), an independent contractor. Temco has a collective bargaining agreement with the Union ("Temco CBA").

On January 1, 1995, PMI entered into a new three-year contract with Temco, under which Temco agreed to continue to provide services for the Building. The contract provided that Temco would provide security services for the Building through Spartan Security Services, Inc. ("Spartan"), a Temco subsidiary. Spartan had been created by Temco sometime in 1993, apparently in response to a New York State law that mandated certain requirements for employers of security personnel.

As of December 31, 1997, sixteen security guards designated as Temco/Spartan employees were employed in the Building.[3] All of the security guards were members of the Union.

---

1. The following facts are from testimony and exhibits received at the January 13, 1998 preliminary injunction hearing and from affidavits and exhibits submitted by the parties.

2. PMI remained managing agent of the Building until December 31, 1997, when CPI absorbed PMI for purposes of consolidating its operations.

   According to a CPI Interoffice Memorandum, CPI "merged" with PMI in response to recent changes in the income tax law that made it unnecessary for CPI "to retain a separate management company for its properties." The merger allowed CPI "to streamline operations and reduce administrative costs." (November 19, 1997 Interoffice Memorandum, Submitted as Defendants' Exhibit 2 at the Preliminary Injunction Hearing ("Defs.' Ex. 2").)

   From the evidence before the Court, it appears that the CPI–PMI merger had little or no practical impact on employees of either PMI or CPI or on the management of the Building.

3. Of the nine security guards who submitted affidavits, six worked in the Building since before CPI assumed ownership. See Affidavit of Keith Worrell ("Worrell Aff.") at ¶ 2 (hired at Building July 21, 1981); Affidavit of Wanda Lopez ("Lopez Aff.") at ¶ 2 (hired August, 1983); Affidavit of Pablo Ramos ("Ramos Aff.") at ¶ 1 (hired 1984); Affidavit of Anthony Rivera ("Rivera Aff.") at ¶ 2 (hired May 13, 1985); Affidavit of Mildred Pippen ("Pippen Aff.") at ¶ 2 (hired April 4, 1988); Affidavit of Tyrone Thomas ("Thomas Aff.") at ¶ 2 (hired November 18, 1988).

   The other three guards began work in 1991, the same year CPI assumed ownership. See Affidavit of John Davis ("Davis Aff.") at ¶ 2 (hired February 4, 1991); Affidavit of Lloyd James ("James Aff.") at ¶ 2 (same); Affidavit of Harvey Haynes ("Haynes Aff.") at ¶ 2 (hired September 23, 1991).

On December 17, 1997, PMI notified Spartan that it would not renew its contract for security services, meaning that Temco/Spartan's contract would expire at midnight on December 31, 1997. Starting January 1, 1998, PMI would contract for security services with OCS Security of Long Island, Inc. ("OCS").

Upon receiving the security contract, OCS sent representatives to the Building to offer the security guards employment. While OCS promised to maintain the guards' current wages, as a non-union shop, it did not offer the same benefits. In the end, one security guard accepted OCS's offer of employment. All the other security guards were locked out at midnight on December 31, 1997.[4]

On December 31, 1997, the Union provided PMI with a demand for arbitration under the RAB Agreement, to which both the Union and PMI are parties. The Union alleged that PMI had violated the RAB Agreement by subcontracting the security services to a company that was not required to hire all incumbent employees and maintain their benefits.

Under the RAB Agreement, unionized employees have certain rights with respect to building managers and owners who belong to the RAB.[5] By joining the RAB on behalf of the Building, PMI had "commit[ted] [the] building to be bound for the remainder of the term of the current Commercial Building Agreement between the RAB and [the Union]." (Application for Commercial Building Membership, Submitted as Exhibit A to Affidavit of Kevin O. McCulloch ("McCulloch Aff."); see also August 12, 1994 Letter from the RAB to the Union, Submitted as Exhibit A to Reply Affidavit of Roderick Johnson ("Johnson Reply Aff.") (notifying Union of Building's membership in RAB).)

The most recent RAB Agreement, which is at issue in this case, is effective January 1, 1996, to December 31, 1998.

4. OCS security personnel currently are employed in the GM Building.

5. The RAB is a multi-employer association that represents commercial building owners and

## DISCUSSION

### I. Preliminary Injunction

To obtain a preliminary injunction, plaintiffs must demonstrate (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in plaintiffs' favor. *International Dairy Foods Ass'n v. Amestoy,* 92 F.3d 67, 70 (2d Cir.1996); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

#### A. Irreparable Harm

Plaintiffs make out a showing of irreparable harm, because if the Union's claim is not arbitrable, plaintiffs would be "forced to expend time and resources arbitrating an issue that is not arbitrable, and for which any award would not be enforceable." *Maryland Casualty Co. v. Realty Advisory Bd. on Labor Relations,* 107 F.3d 979, 984–85 (2d Cir. 1997). Accordingly, the Court now turns to the merits of plaintiffs' claim.

#### B. Likelihood of Success on the Merits

The merits of this preliminary injunction action concern the arbitrability of the dispute between plaintiffs and the Union. There is no dispute that PMI is a signatory member of the RAB. The parties, however, disagree over whether the underlying dispute involving the security guards is covered by the RAB Agreement.

##### 1. The Court's Jurisdiction

■ As a preliminary matter, the Court must determine whether it has jurisdiction to determine the arbitrability of the Union's grievance. The Union contends that this preliminary question is within the sole authority of the arbitrator. The Court disagrees.

■ In three cases known as the *Steelworkers Trilogy,*[6] the Supreme Court estab-

managing agents in collective bargaining negotiations with the Union.

6. *See United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), *United Steelworkers v. Warrior & Gulf*

294

lished the basic principles governing the adjudication of arbitrability disputes in the federal courts. These are: (1) " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit,' " (2) " 'the question of arbitrability—whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination,' " and (3) "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims' " *Maryland Casualty,* 107 F.3d at 982 (*quoting AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648–50, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (internal quotations and citations omitted)).

▮▮▮ Furthermore, where the collective bargaining agreement contains an arbitration clause, there is a presumption favoring arbitrability, especially where the clause is broad, such as the one at issue in this case. *See AT & T Techs.,* 475 U.S. at 650, 106 S.Ct. 1415; *Maryland Casualty,* 107 F.3d at 982; *see also, infra* RAB Agreement, at Art. VIII, § 1. "However, even when the agreement contains a broad arbitration clause, a dispute is not arbitrable if (1) an express provision in the collective bargaining agreement excludes the particular grievance from arbitration, or (2) 'forceful evidence of a purpose to exclude the claim from arbitration' is presented." *Maryland Casualty,* 107 F.3d at 982 (*quoting AT & T Techs.,* 475 U.S. at 650, 106 S.Ct. 1415).

Applying these principles to this case, it is clear that the Court, and not the arbitrator, must decide the arbitrability of this controversy and whether plaintiffs can be compelled to arbitrate. This necessarily includes resolution of the issue of whether PMI was a joint employer of the security guards, because, if so, plaintiffs would be contractually

*Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), and *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

7. Relying on *Port Authority v. Office of the Contract Arbitrator,* 660 N.Y.S.2d 408 (1st Dept. 1997), the Union persists in arguing that the

obligated to arbitrate the dispute under the RAB Agreement. *See Newmark & Lewis, Inc. v. Local 814, International Brotherhood of Teamsters,* 776 F.Supp. 102, 106 (E.D.N.Y. 1991); *see also Kansas City Southern Transp. Co. v. Teamsters Local Union # 41,* 126 F.3d 1059, 1063–64 (8th Cir.1997); *Metropolitan Detroit Bricklayers Dist. Council v. J.E. Hoetger & Co.,* 672 F.2d 580, 583 (6th Cir.1982).[7]

### 2. *Interpretation of the RAB Agreement*

The RAB Agreement provides, in relevant part:

Article I. 1. This agreement shall apply to all classifications of service employees employed by the Employer, excluding, except as otherwise provided herein, employees employed by cleaning and maintenance contractors.

.    .    .    .    .

Article II. 1. The Employer shall not make any agreement or arrangement for the performance of work and/or for the categories of work heretofore performed by employees covered by this agreement except within the provisions and limitations set forth below.

2. The Employer shall give advance written notice to the RAB and the Union at least three (3) weeks prior to the effective date of its contracting for such services, or changing contractors, indicating the name and address of the contractor.

3. The Employer shall require the contractor to retain all bargaining unit employees working at the location at the time the contract was awarded and to maintain the existing wage and benefit structure. . . .

The Employer agrees that employees then engaged in the work which is contracted out shall become employees of the initial contractor or any successor contrac-

question of whether PMI was a joint employer should be left to the arbitrator. The Court disagrees and notes that *Port Authority* is distinguishable on its face because, there, the contractor was not a cleaning and maintenance contractor.

tor, and agrees to employ or re-employ those employees working for the contractor when the contract is terminated or cancelled.

. . . . .

6. This Article is intended to be a work preservation provision for the employees employed in a particular building.

. . . . .

Article VIII. 1. A Contract Arbitrator shall have the power to decide all differences arising between the parties as to interpretation, application or performance of any part of this agreement. . . .

RAB Agreement.

Plaintiffs argue that the Union's grievance is not arbitrable because it falls within the express exclusion in the RAB Agreement for "employees employed by cleaning and maintenance contractors." *See* RAB Agreement at Art. I, § 1.[8] Specifically, plaintiffs argue that the security guards were employed by Temco/Spartan, and that Temco/Spartan is a cleaning and maintenance contractor.

The Union, on the other hand, contends that the security guards fall within an exception to the cleaning and maintenance exclusion, because they were employed not only by Temco/Spartan, but also by PMI, in a joint employer relationship. As employees of PMI, the Union contends, the security guards were covered by the "work preservation provision" contained in Article II of the RAB Agreement, under which PMI, as an employer, has certain obligations when subcontracting.[9]

▮ The Court agrees with the Union's interpretation of the RAB Agreement. The cleaning and maintenance exclusion must be interpreted within the context of the RAB Agreement as a whole. To hold that the

exclusion applies whenever a cleaning and maintenance contractor employs personnel within the Building, as plaintiffs claim, would render the "except as otherwise provided herein" language that precedes the exclusion superfluous. Such a reading should be avoided in contract interpretation. *See Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993). Properly interpreted, it is clear that the RAB Agreement provides for exceptions to the cleaning and maintenance exclusion.

One such exception, as the Union correctly points out, is the "work preservation provision" contained in Article II of the RAB Agreement. Under that provision, PMI could not contract out work that currently was being done by PMI employees unless it first made certain demands on the contractor with respect to the employees' wages and benefits, and otherwise complied with the requirements of the work preservation provision. *See* RAB Agreement, Art. II, § 3.

This interpretation of the RAB Agreement is consistent with prior interpretations of the same agreement by courts in this circuit. For example, in *Maryland Casualty,* the Second Circuit interpreted the work preservation provision as excepting from the cleaning and maintenance exclusion those employees who had been "employed ... by the building owner or agent 'at the time the [cleaning] contract was awarded.'" 107 F.3d at 983; *see also, Bevona v. 820 Second Ave. Assocs.,* 27 F.3d 37, 39 (2d Cir.1994). By recognizing this exception, the Second Circuit implicitly rejected plaintiffs' current argument that the cleaning and maintenance exclusion is absolute. Moreover, in holding that the work preservation provision did not apply in *Maryland Casualty,* the Second Circuit noted that its conclusion might have

8. In an argument that merits little response, plaintiffs also have suggested that they are not bound by the RAB Agreement because PMI withdrew from RAB membership as of December 31, 1997. Whatever the effect of that withdrawal in other contexts, it is clear that such withdrawal has no bearing on PMI's already-existing collective bargaining obligations under the RAB Agreement, which is in effect until December 31, 1998.

9. As an alternative argument, the Union claims that the cleaning and maintenance exception should not apply because Spartan is not a "cleaning and maintenance contractor," within the meaning of the RAB Agreement. Plaintiffs counter that PMI's contract was with Temco, which is a "cleaning and maintenance contractor." The Court need not resolve this dispute, since it concludes that PMI is subject to the RAB Agreement based on its status as a joint employer.

been different if the Union had presented evidence that the discharged employees were employed by the building owner or manager at the time their work was contracted. *Id.* at 983–84. This is precisely the type of evidence that has been presented by the Union in this case.

Accordingly, the Court now turns to whether the Union's claim falls within this recognized exception to the cleaning and maintenance exclusion—namely, whether the security guards were employed by PMI at the time PMI contracted with OCS, such that the work preservation provision was triggered.

### 3. *Joint Employer*[10]

■ Whether PMI possessed sufficient control over the security guards to qualify as a joint employer is essentially a factual issue, which turns on a weighing of five factors: (1) hiring and firing; (2) discipline; (3) pay, insurance, and records; (4) supervision; and (5) participation in the collective bargaining process. *Clinton's Ditch Coop. Co. v. NLRB,* 778 F.2d 132, 136, 138–39 (2d Cir.1985), *cert. denied,* 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986). An "essential element" to the Court's analysis is whether PMI exercised "immediate control over" the security guards. *Id.* at 138.

Before turning to the five factors discussed in *Clinton's Ditch,* the Court notes that the organization of the security guards supports a finding that PMI was a joint employer. The security guards were broken into security officers and "corporals." The corporals served as Fire Safety Directors and had little or no authority over the other security guards. Above the guards were two Shift Supervisors, known as "sergeants," who answered directly to Security Chief James A. Henry. Chief Henry, in turn, worked under

Jerome P. Hopko, Director of Security and Maintenance. Hopko answered directly to Roderick Johnson, a Vice President of PMI. Within this chain of command, only the security guards were on the Spartan payroll. All other employees received paychecks directly from PMI. Notably, Elizabeth Carbonaro, Temco's liaison to by the Building, was not considered part of the chain of command by the guards, nor does she appear on the "GM/CPI Building Group" organizational chart dated July, 1997. *See* McCulloch Aff., Ex. M.

#### a. *Hiring and Firing*

Candidates for security guard positions were selected by Temco/Spartan based on PMI's requirements and standards and then sent to PMI to interview with Chief Henry. *See* Affidavit of William Jakoby ("Jakoby Aff.") at ¶ 3, Ex. A. Several of the security guards who submitted affidavits stated that they received their offers of employment directly from Chief Henry at the conclusion of their interviews. The others received their offers from Chief Henry after a few days or one or two weeks. A November 12, 1993 letter from Carbonaro to Hopko confirmed that PMI made the final decisions in hiring. *See* Jakoby Aff., Ex. F at 2 ("Once [the security guards] meet the necessary requirement for interviewing, they will be sent to Pembrook for selection.").

At the conclusion of the interview or after receiving their offers, security guards were taken to Hopko, who was introduced as the Director of Security for the GM Building. Hired security guards were given uniforms with a PMI patch and issued a badge, both of which identified the guards as "General Motors Security." *See* Jakoby Aff., Ex. D at 1. They were also given identification cards, which read "Pembrook Management, Inc." in large letters above "General Motors Building" and "Temco Services Inc." *See* Defs.'

---

10. The Court bases its findings in this section in large part on the uncontroverted affidavits of nine of the dismissed security guards involved in this case. While plaintiffs were given ample opportunity to cross examine these witnesses at the preliminary injunction hearing, they instead relied solely on the conclusory assertions of Roderick Johnson, a Vice President for PMI, who submitted two affidavits in this case and testified at the preliminary injunction hearing.

The Court also has considered the affidavit of William Jakoby, a personnel manager for Spartan, the testimony of Fred Owens, a PMI-employed sergeant, and personnel records maintained by PMI for security guard Pablo Ramos, which were submitted as Defendants' Exhibit 1 ("Defs.' Ex. 1") at the preliminary injunction hearing.

Ex. 1. On their first day of work, security guards were greeted by a PMI-employed sergeant.

As for firing, PMI could and did recommend the dismissal of security guards, which resulted in guards being fired. However, because of the guards' rights under the Temco CBA, PMI had to abide by any arbitration decisions that granted reinstatement.

### b. *Discipline*

Authority to discipline the security guards rested primarily, if not exclusively, with PMI personnel. As stated by William Jakoby, a personnel manager for Spartan, "[w]ith regard to disciplinary actions, Spartan does not have any input, but rather follows the directives of Pembrook Management." Jakoby Aff. at ¶ 5.

Disciplinary actions originated with the sergeants, who were PMI employees. *See* Jakoby Aff. at ¶ 5. Typically, a sergeant would prepare a report detailing an alleged infraction, recommend disciplinary action, and forward the report to Chief Henry for further review. Chief Henry would then direct the sergeant's report with any instructions to Temco/Spartan "for necessary action." Temco/Spartan, in turn, would send a letter to the security guard notifying him or her of the punishment imposed by PMI.

All notices of disciplinary actions were either co-signed by Chief Henry or copied to him. While PMI has tried to claim that the signature by Chief Henry was a mere formality,[11] the Court has received ample evidence to the contrary. For example, an October 18, 1993 letter from Hopko to Carbonaro admonished Temco/Spartan for taking disciplinary actions without prior PMI approval. *See* Jakoby Aff., Ex. C ("[r]egarding the disciplinary letters—they should not have been written without prior consultation. As you may recall, at our most recent meeting . . . it was agreed that no disciplinary action would be initiated without PMI approval.").

Moreover, documents retrieved from PMI's files demonstrate that Chief Henry conducted his own disciplinary investigations, which consisted of interviews with guards suspected of infractions and the forwarding of reports to Hopko. *See* Defs.' Ex. 1. At the conclusion of these investigations, Chief Henry issued disciplinary orders that had to be followed, unless Chief Henry or Hopko gave permission otherwise. *Id.*

PMI also issued "commendation" letters and distributed award checks to security guards who performed particularly well in their jobs. *Id.*

### c. *Pay, Insurance, and Records*

PMI played some role—albeit more limited than in other areas—in providing the security guards with pay, insurance, and benefits. According to sergeant Fred Owens, PMI-employed sergeants prepared day-to-day records of security guards' hours, including overtime, and then compiled end-of-the-week reports to send to Chief Henry. The security guards received their paychecks, however, from Temco/Spartan on Temco/Spartan checks. Temco/Spartan also provided insurance and other employee benefits and maintained records of the guards' employment.

PMI did, however, maintain its own detailed records for each of the security guards. For example, in the file of Pablo Ramos, PMI kept extensive records of disciplinary actions and related investigations, notices of doctors' appointments, records of jury duty, requests for vacation time, medical reports, employment applications, letters of recommendation, scheduling records, and inventories of distributed uniforms and equipment. *See* Defs.' Ex. 1.

### d. *Supervision*

Most indicative of PMI's status as a joint employer is PMI's control over day-to-day supervision of the security guards.

---

11. In support of this argument, plaintiffs submitted a letter from Hopko to Carbonaro questioning why Chief Henry's signature was necessary on termination notices, as well as Carbonaro's response to the letter, indicating that Chief Henry's signature served to ensure that PMI had notice of and agreed with any actions taken. *See* Johnson Reply Aff., Ex. D. Whatever the significance of these letters at the time, the Court finds that PMI's subsequent actions make clear that PMI was involved more heavily in the discipline of the security guards than these letters might suggest.

All of the security guards who submitted affidavits agreed that supervision by PMI included all scheduling assignments, where a security guard was to work during a particular shift, and, most significantly, monitoring of how a security guard was to conduct himself or herself while on duty. At least one security guard was given a PMI Personnel Manual when he started work, and told by Chief Henry that these were the rules and regulations that governed a security guard's conduct. *See* Haynes Aff. at ¶ 7. That PMI promulgated the rules for the security guards was confirmed by Jakoby, who stated "[i]t is the building that generates the rules and regulations that each security officer is required to sign as part of [his or her] pre-employment interview." Jakoby Aff. at ¶ 7.

Direct supervision of the security guards fell to the sergeants and, in turn, to Chief Henry. Sergeants evaluated the conduct of the security guards during fire drills, inspected guards, posts and the areas and equipment that they were responsible for, and monitored surveillance tapes to ensure that the guards were enforcing the security rules of the Building. *See, e.g.,* Ramos Aff., Exs. D, F, G.

In contrast, no employee of Temco or Spartan exercised any supervisory authority over the security workers. *See e.g.,* Pippin Aff. at ¶ 6; Haynes Aff. at ¶ 8. While Johnson testified that the security guards had contact daily with Carbonaro, the security guards stated that they never were supervised by anyone other than management employees of PMI, and that their only personal contact with Temco/Spartan personnel was in payroll matters and in security guard certification classes. The Court credits the guards' statements.[12] *See also,* Ramos Aff., Ex. H (October 3, 1995 Letter from Carbonaro to Ramos, in which Carbonaro characterizes PMI-employed sergeant Eric Clarke as "your supervisor").

Moreover, PMI employed Chief Henry specifically to supervise the security guards. In Roderick Johnson's words, Chief Henry "was directly responsible for the day to day

operation of a 3–shift security staff which functioned on a continuous basis." McCulloch Aff. at Ex. L.

PMI also directed all scheduling for the security guards, determining shifts and the number of guards that would be working on each shift. *See* Jakoby Aff. at ¶ 6, Ex. D at 2. Temco/Spartan would then perform the ministerial task of managing the schedules and disseminating holiday information. *See* Johnson Reply Aff. at ¶ 16. PMI also was responsible for setting the method for layoffs and for authorizing vacations and overtime. *See* Jakoby Aff. at ¶ 6, Ex. E; Defs.' Ex. 1.

### e. *Participation in the Collective Bargaining Process*

There is no evidence that PMI played any role in the negotiation of the Temco CBA. On the other hand, PMI did have an interest in the outcome of the negotiations, in that PMI obligated itself to reimburse Temco/Spartan for arbitration awards involving the security guards.

This factor, however, has less relevance in this case than in those cases where a union attempts to use the joint employer theory to obligate a building owner to a collective bargaining agreement with the contractor. *See, e.g., Local 773, International Brotherhood of Teamsters v. Cotter & Co.,* 691 F.Supp. 875, 876, 879 (E.D.Pa.1988). In those cases, the owner's participation is relevant to whether he could have foreseen that he would have to arbitrate under the agreement in question. In contrast, here the Union seeks to obligate plaintiffs not under the Temco CBA, but under the RAB Agreement, of which PMI clearly was a negotiating party.

### f. *Weighing the Factors*

Weighing these five factors, the Court concludes that the Union has put forth sufficient evidence to show that PMI had immediate control over the security guards, particularly in terms of hiring, discipline and day-to-day supervision. PMI's active—and indeed almost exclusive—authority over the security guards in these areas demonstrates that PMI was a joint employer.[13]

---

12. No testimony or affidavits have been submitted by Carbonaro.

13. Plaintiffs dispute their role as a joint employer by relying, in part, on PMI's contract with Tem-

As a joint employer, PMI must arbitrate the Union's grievance under the work preservation provision of the RAB Agreement.

### 4. *Longstreet and CPI*

Having found that PMI is bound under the RAB Agreement, the Court now turns to Longstreet and CPI.

Plaintiffs argue that, at a minimum, the Court should enjoin the Union from arbitrating against Longstreet and CPI, because neither Longstreet nor CPI is a signatory member of the RAB. Plaintiffs further argue that the Union has failed to prove that either Longstreet or CPI is an employer of the security guards. The Court rejects these arguments.

■ As an initial matter, the record is clear that PMI expressly bound Longstreet to the RAB Agreement by signing as the Building's agent. As McCulloch testified, when a managing agent signs the RAB membership agreement for a commercial building, he commits the building—and its owner—to the terms of any collective bargaining agreement negotiated by the RAB. *See also, Property Advisory Group v. Bevona,* 718 F.Supp. 209, 211–12 (S.D.N.Y.1989) (recognizing that it is "common practice and custom throughout the commercial building industry in New York City for managing agents to bind owners of buildings to collective bargaining agreements with the Union."). Indeed, by joining the RAB, the Building gained the benefit of certain provisions of the RAB Agreement related to workers' hours, flexibility, absentees and reductions in workforce. *See* RAB Agreement at Art. II, § 4; McCulloch Aff. at ¶ 13–14; *see also, Property Advisory Group,* 718 F.Supp. at 214 (discussing same provisions). Absent evidence that PMI lacked authority to bind Longstreet—and no

such evidence has been presented here— Longstreet is bound to the RAB Agreement under basic principles of agency law. *See id.* at 212–13.

■ Moreover, with respect to CPI, by "absorb[ing]" PMI, *see* Defs.' Ex. 2, and by becoming the Building's new managing agent, CPI assumed PMI's obligations under the RAB Agreement. *See Property Advisory Group, Inc. v. Bevona,* 718 F.Supp. 209, 212–14 (S.D.N.Y.1989).[14]

Finally, in view of the interlocking relationships between CPI, Longstreet, and PMI, once PMI is required to arbitrate under the RAB Agreement, CPI and Longstreet cannot sustain their burdens of showing irreparable harm and likelihood of success on the merits in this case.

Accordingly, Longstreet and CPI must arbitrate with the Union under the RAB Agreement.

### 5. *Waiver/Estoppel*

■ Plaintiffs' final argument is that the Union should be estopped from arbitrating under the RAB Agreement because the Union treated Temco/Spartan as the sole employer of the security guards throughout the parties' relationship. This claim is without merit.

First, plaintiffs have submitted no legal authority—and the Court is aware of no authority—to support this claim. Second, even if a union could be found to have waived its rights under a collective bargaining agreement through its conduct, the Court finds that plaintiffs have failed to prove a waiver in this case. That the Union brought all prior grievances against Temco/Spartan is not surprising given that those grievances were for alleged violations of the Temco CBA. Here, however, and for the first time with respect

---

co, in which the parties agreed that PMI would not be an employer of the security guards. In that contract, the parties agreed that, "[f]or the avoidance of doubt ... the manner and means of conducting the [security guards'] work [would be] under the sole control of [Temco]." *See* Affidavit of Roderick Johnson ("Johnson Aff."), Ex. A at ¶ 3(a). The Court is unpersuaded by this argument, because, in determining joint employer status, it is PMI's actions and not its words that control.

**14.** Plaintiffs' contention that the Union has failed to prove that Longstreet or CPI acted as an employer of the security guards is misplaced. The Court's conclusion that Longstreet and CPI must arbitrate is based on principles of agency law, and not on whether Longstreet or CPI acted as an employer. *See Property Advisory Group,* 718 F.Supp. at 211 (involving analogous fact pattern).

to these workers, the Union claims a violation of the RAB Agreement; logic dictates that the Union's claim would be against plaintiffs, the parties to that agreement. Third, the Union's designation of Temco/Spartan as the security guards' employer on grievances brought under the Temco CBA is not inconsistent with the conclusion that PMI was also a joint employer. Finally, insofar as an important component of any claim of estoppel is notice, PMI cannot claim a lack of notice when PMI itself actively engaged in the hiring, disciplining, and supervising of the security guards, and otherwise acted as a joint employer.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for a preliminary injunction is denied and the temporary restraining order preventing the Union from proceeding to arbitration is dissolved.

**SO ORDERED:**